BOWES, ADMR., ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* CINCINNATI RIVERFRONT COLISEUM, INC. ET AL., APPELLEES AND CROSS-APPELLANTS.

(Nos. C-830013 and -830073—Decided August 24, 1983.)

*Mr. Thomas L. Conlan,* for appellants and cross-appellees.

*Messrs. McCaslin, Imbus & McCaslin* and *Mr. Clement J. DeMichelis,* for appellee and cross-appellant city of Cincinnati.

*Messrs. Paxton & Seasongood* and *Mr. Thomas L. Eagen, Jr.,* for appellees and cross-appellants Cincinnati Riverfront Coliseum, Inc., Brian E. Heekin and directors of CRC, Inc.

*Messrs. Lindhorst & Dreidame* and *Mr. James J. Slattery, Jr.,* for appellee and cross-appellant Electric Factory Concerts.

*Droder & Miller Co., L.P.A.,* and *Mr. A. Dennis Miller,* for appellees and cross-appellants The Who, Tidal Wave Promotions, Inc. and Dalpepper Enterprises, Ltd.

## I

*Per Curiam.* Multitudinous causes (specifically fifty distinct appeals) came on to be heard upon the appeals, the transcripts of the docket, journal entries and original papers from the Court of Common Pleas of Hamilton County, evidence in connection with Civ. R. 56 motions, the briefs, the assignments of error and oral arguments of counsel. All the appeals herein (including appeals from decisions on cross-claims) were consolidated into a single appellate number, *viz.* C-830008. Subsequent to the oral arguments and submission of all fifty appeals, various parties compromised and agreed that their appellate proceedings be dismissed, and this court has therefore ordered those cases dismissed pursuant to App. R. 28. The cause not dismissed is composed of appellate case numbers C-830013 and C-830073, being case number A-7911085 in the Hamilton County Court of Common Pleas.

On December 3, 1979, The Who rock group performed at a concert at Cincinnati Riverfront Coliseum. Patrons and would-be patrons died while entering the Coliseum. These cases seek damages for the alleged wrongful deaths and personal injuries.[1] The caption herein delineates the defendants, but we shall nevertheless additionally identify them. The defendants are: the Cincinnati Riverfront Coliseum, Inc. ("Coliseum"), locale of the rock performance; Brian E. Heekin, who was on December 3, 1979, a shareholder, director, the President and chief operating officer of the Coliseum, taking an active part in its day-to-day operations; the city of Cincinnati; The Who, and its four partners individually, as well as William George Curbishley, the group's personal manager who was present at the Coliseum on the evening of the instant incident; Electric Factory Concerts, local promoter of The Who on December 3, 1979; Tidal Wave Promotions, Inc., which was responsible for providing the touring facilities for The Who; nine directors of the Coliseum and Dalpepper Enterprises, Ltd., technical employer of The Who for performances outside the United Kingdom. Defendants seasonably filed motions seeking full or partial summary judgment on issues of liability. On December 23, 1982, the trial court entered "Orders On Motions For Summary Judgment." This entry in pertinent portions follows:

"All defendants in the 'Coliseum Litigation,' under the related case numbers named above, have submitted motions for either partial summary judgment, to dismiss punitive damage claims against them, and/or complete summary judgment to dismiss the total claim against them. Plaintiffs in these cases have also filed a consolidated motion for

---

[1] Eleven deaths occurred. Actions were brought on behalf of ten.

This decision was substantially in its present form prior to an eleventh hour dismissal of all actions except that of Richard M. Bowes, Administrator of the Estate of Peter D.

Bowes, deceased, which remains viable. The dismissals occurred only several hours before the scheduled release of the completed decision. Thus the decision refers to "plaintiffs" whereas the correct denomination *now* should be "plaintiff."

summary judgment seeking to strike the defense of assumption of risk. This Court having considered the motions, supporting memoranda, memoranda in opposition, reply memoranda, and supplemental memoranda, together with exhibits, depositions, affidavits, interrogatories, and the pleadings, now rules as follows, and accordingly

.‘‘ORDERS:

‘‘1. Defendant Cincinnati Riverfront Coliseum, Inc.'s motion for partial summary judgment seeking to dismiss the punitive damage claims is granted;

‘‘2. Defendants' The Who, Roger Daltry [sic], Kenny Jones, John Entwhistle, Peter Townshend, Tidal Wave Promotions, Inc., William Curbishley, and Dalpepper Enterprises, Ltd. motion for partial summary judgment on punitive damages is granted, and their motion seeking dismissal of all claims is overruled;

‘‘3. Defendant Electric Factory Concerts' motion for partial summary judgment on punitive damages is granted, and their motion seeking dismissal of all claims is overruled;

. . ‘‘4. Defendants' George E. Heekin, Charles L. Heekin, Albert E. Heekin, III, Philip G. Smith, James J. Rammacher, Robert H. Castellini, Lawrence H. Kyte, Jr., William O. DeWitt, Jr., and William O. DeWitt, Sr., directors of CRC, Inc., motion for summary judgment seeking dismissal of all claims against them is granted, and they are hereby dismissed;

‘‘5. Defendant Brian Heekin's motion for summary judgment seeking dismissal of all claims against him is granted, and he is hereby dismissed;

‘‘6. Defendant the City of Cincinnati's motion for summary judgment seeking dismissal of all claims by plaintiffs against it is granted, and all crossclaims against it are dismissed except those of Cincinnati Riverfront Coliseum, Inc.;

‘‘7. Plaintiffs' motion for partial summary judgment seeking to strike the defense of assumption of risk is overruled. * * *''

Thus, it is apparent that the trial court rendered favorable partial summary judgments for certain of the defendants on the plaintiffs' claims for wanton and reckless misconduct which plaintiffs wished to pursue in order to secure punitive damages. Also, the trial court, through its holdings on the defendants' motions for summary judgment, dismissed as defendants the city of Cincinnati (except as to the Coliseum's cross-claim against the city), the board of directors of Cincinnati Riverfront Coliseum, Inc. and Brian Heekin, who while also a member of the board, was additionally singled out by plaintiffs as an independent target of the actions because of his admitted role as operating officer of the Coliseum.[2]

These appeals ensued, and five assignments of error are advanced, the first of which states:

‘‘The trial court erred in rendering summary judgments in cases which are both factually and legally complex.''

The issue said to be thus presented for our review is:

‘‘In cases which are procedurally, factually, and legally complex, it is inappropriate for the trial court summarily to dispose of all or any part of the plaintiffs' claims without a full development of the evidence at trial.''

---

[2] Plaintiffs' motion for partial summary judgment seeking to strike the defense of assumption of risk was overruled. However, plaintiffs-appellants do not challenge that holding in this appeal.

Moreover, although the city has cross-appeals against the board of directors of the Coliseum and Brian Heekin, it presents no cross-appeal or assignment of error challenging the order below retaining the city in the litigation insofar as the Coliseum's cross-claim against it is concerned. (Paragraph 6 of ‘‘Orders on Motions For Summary Judgment,'' supra.)

Hence, plaintiffs would have us write a rule that Civ. R. 56 providing for summary judgments does not apply to factually and legally complex cases. We do have an unusually voluminous record containing, of course, matters which were before the trial court, and we are willing to assume, *arguendo,* that the matters *sub judice* are "factually and legally complex." Civ. R. 56 provides for the manner in which motions for summary judgments are to be considered and mandates the standards to be used in deciding such motions. The rule does not exclude "factually and legally complex" cases from resolution by summary judgment when appropriate. Such cases are *not* inappropriate for summary judgment. Assignment one is of no avail.

We pass over assignment two for subsequent examination.

## II

The third assignment of error is:

"The trial court erred in rendering summary judgment in favor of the City of Cincinnati."

Plaintiffs contend that the city of Cincinnati was negligent and that it is not protected by the doctrine of municipal immunity (sometimes referred to as sovereign or governmental immunity) as held below, that the city violated R.C. 723.01 in permitting the accumulation of such a crowd on December 3, 1979, as amounted to a nuisance; and that the city is liable under Section 1983, Title 42, U.S. Code, for a violation of the civil rights of the patrons on December 3, in that the city failed legislatively or administratively to prohibit festival seating[3] at the Coliseum or to take affirmative steps adequately and effectively to obviate certain hazards.

We agree that the trial court did err in granting summary judgment in favor of the city vis-a-vis the claimed negligence or wrongful acts or omissions of its agents or employees. Plaintiffs argue that this result is mandated by *Haverlack* v. *Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26, and *King* v. *Williams* (1983), 5 Ohio St. 3d 137. We reverse this portion of the summary judgment in favor of the city upon the authority of *Haverlack* and *King, supra,* but particularly upon *Enghauser Mfg. Co.* v. *Eriksson Engineering Ltd.* (1983), 6 Ohio St. 3d 31, the syllabus of which holds:

"1. The judicially created doctrine of municipal immunity is, within certain limits, abolished, thereby rendering municipal corporations subject to suit for damages by individuals injured by the negligence or wrongful acts or omissions of their agents or employees whether such agents and employees are engaged in proprietary or governmental functions. (*Dayton* v. *Pease,* 4 Ohio St. 80, and its progeny overruled; *Haverlack* v. *Portage Homes, Inc.,* 2 Ohio St. 3d 26, followed and extended.)

"2. Under this decision abolishing municipal immunity, no tort action will lie against a municipal corporation for those acts or omissions involving the exercise of a legislative or judicial function or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, municipalities will be held liable, the same as private corporations and persons, for the negligence of their employees and agents in the performance of the activities."

[3] Festival seating simply described seems to be a "first come first served" arrangement encouraging patrons to enter a concert hall or auditorium as soon as possible thus accomplishing better seating or better locations since apparently inherent in so-called festival seating is the decision of some patrons to choose to stand in strategic locations. There is evidence that festival seating abets pushing and shoving.

In *Enghauser* the Supreme Court emphasized that so far as municipal government is concerned, the rule is liability — the exception is immunity. None of the exceptions to municipal liability delineated in *Enghauser* exists here.

We agree with the trial court in its holding that there is no genuine issue as to any material fact raised in the plaintiffs' complaint on either the nuisance theory or the contention that the city violated the civil rights of plaintiffs or plaintiffs' decedents contrary to Section 1983, Title 42, U.S. Code. Thus, assignment of error three is reversed in part and affirmed in part as indicated.[4]

The fourth assignment of error claims that:

"The trial court erred in rendering summary judgment in favor of the board of directors of Riverfront Coliseum."

Presented thereby for appellate review is whether the actions of the Coliseum directors *as directors,* with particular respect to the December 3, 1979 incident, constitute triable issues of fact. The summary judgment in their favor, if it stands, of course removes them from this Coliseum litigation.

This assignment presents an extremely troublesome issue. The plaintiffs rely heavily upon R.C. 1701.59, necessarily the version which was in effect on the date of The Who concert in 1979. That section was revised in 1980 and 1981. The appropriate R.C. 1701.59 did provide, *inter alia,* that "all the authority of a corporation shall be exercised by its directors."

Although admitting its general relevance, we believe we must consider more than this general statutory provision to decide whether summary judgment in favor of the directors should have been granted. For instance, the present R.C. 1701.59, portions of which became effective in 1980 and 1981, provides as follows:

"(B) A director shall perform his duties as a director, including his duties as a member of any committee of the directors upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interest of the corporation, *and with the care that an ordinarily prudent person in a like position would use under similar circumstances.*" (Emphasis added.)

It cannot facilely be ascertained that the present R.C. 1701.59(B), *supra,* directly applies to the relationship between corporate directors and third persons, such as the plaintiffs here. The legislature may have intended the enactment to apply principally to the relationship between directors and their corporation. Regardless, we ascribe some significance to R.C. 1701.59, old and new, vis-a-vis the appeals *sub judice.* The present section (B), above, in its requirement that directors shall perform their duties as directors with the care that an ordinarily prudent person in a like position would use under similar circumstances certainly is entitled to some consideration as a guide to the public policy of the state even though (B), as now constituted, was

---

[4] In granting the city of Cincinnati's motion for summary judgment seeking dismissal of all claims by plaintiffs against it, and all cross-claims except the Coliseum's, the trial court did not struggle with whether the city could be liable for punitive damages. There would have been no good reason for the trial judge to have done so. The order of December 23, 1982, disposing of the various motions for summary judgment, makes no mention of punitive damages vis-a-vis the city nor does the judge's letter opinion sent to the city's counsel.

The court below ruled the city out as explicated, and as a result of our holding herein the city returns to the litigation as a party to face plaintiffs' claims of negligence, wrongful acts or omissions, but not to defend further on plaintiffs' theories of nuisance or violation of civil rights. We lay stress upon the point that the issue of potential recovery of punitive damages from the city by the plaintiffs is therefore not before us in this appeal. The plaintiffs' brief recognizes this.

not enacted until a few months after December 1979.

Unquestionably, the directors delegated to Brian Heekin and other members of an operating team for the Coliseum many responsibilities, which, under law, they were justified in doing. There is evidence that Brian Heekin and his "team" were experienced. On the other hand, as plaintiffs argue, the directors as a board did not make or participate in any decisions or undertake any assignments pertinent to concerts generally, or crowd control, seating policies, or security measures specifically. The directors' own brief acknowledges this abdication. We are confronted with the question of whether under all the circumstances the directors were lawfully justified in delegating to others to the extent that they did. We examine this mindful that we are reviewing a Civ. R. 56 resolution by the trial court which decided that the moving parties (the directors) were and are entitled to judgment in their favor as a matter of law and thereby dismissing all plaintiffs' claims against them individually. We quote the following from Civ. R. 56(C):

"* * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party [the plaintiffs below] against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"

We have used the wording "under all the circumstances." In the context of this Coliseum litigation, the phrase connotes, *inter alia,* that the directors were fully aware of the public nature of the Coliseum's business. In his deposition William O. DeWitt, Jr. testified:

"Q. What was the business of the Cincinnati Riverfront Coliseum from its inception?

"A. The business of the Coliseum was to lease the facility to various-entertainment-sports tenants to collect revenues therefrom and hopefully pay the debt service that was on the facility and create a profit."

This complete awareness of the public nature of the Coliseum's actual and intended operation was typical of all six directors deposed.

On and prior to December 3, 1979, the directors of the Coliseum also knew of the festival seating and crowd control problems. For instance, immediately following the Elton John concert on August 3, 1976, then City Manager William V. Donaldson commissioned a "Public Safety Study Team — Riverfront Coliseum" (hereinafter "PSST") whose chairperson was James D. Jester, Superintendent of the Highway Maintenance Division of the city of Cincinnati. The purpose of PSST was to have representatives of the different city agencies meet with Coliseum officials in an attempt to address and correct crowd problems at Coliseum events which had at that time — in 1976 — already occurred a number of times. The directors of the Coliseum were aware of the festival seating problems and the formation of PSST and the reason why the city manager established PSST.

It is emphasized that the record *sub judice* shows that the directors were aware of patron safety problems at the Coliseum. In view of this knowledge, the direct question confronting this court then is whether the trial court ruled correctly in holding as a matter of law that there is no genuine issue of material fact as to whether the directors acted with legal responsibility or whether they did absolutely nothing, or not enough. To affirm what was decided below we would have to be convinced that reasonable minds could come to but one conclusion and that conclusion would be adverse to the plaintiffs. We are unable so to conclude. Ultimate personal liability of the directors is not presently before us;

rather, we find that using the tests of Civ. R. 56, as we must, the directors of the Coliseum should not have been dismissed from the Coliseum litigation. Therefore, the fourth assignment is well-taken.[5]

That the trial court erred in rendering summary judgment in favor of Brian Heekin and dismissing him from the cases is the challenge of assignment of error five. The appellants' interpretation of the issue thus presented for review and arguments follows:

"The record in this case presents factual issues concerning the personal liability of Brian Heekin, as a Coliseum officer and director, for The Who concert tragedy."

Not surprisingly, the plaintiffs assert that if the decision of the trial court that the directors were entitled to summary judgment and dismissal is reversed, "then the reversal of the summary judgment for Brian Heekin must automatically follow." In a word, the plaintiffs are correct in this contention. Brian Heekin was a director himself, shareholder, and the President of the Cincinnati Riverfront Coliseum. As the chief operating officer he was manifestly *the* Coliseum's headman with untrammeled sanction from the board; the power was concentrated in him and he exercised it authoritatively.[6]

Under Ohio law, corporate officers may be held personally liable in tort. In *Schaefer* v. *D. & J. Produce* (1978), 62 Ohio App. 2d 53 [16 O.O.3d 108], motion to certify overruled (Nov. 3, 1978), the Court of Appeals for Erie County was confronted with a case involving personal injuries and ensuing death as a result of a vehicle accident which occurred when a truck owned by defendant D & J Produce, Inc. failed to stop at a stop sign and collided with the vehicle driven by plaintiff's decedent. Plaintiff contended that the offending vehicle had a defective braking system, no operative hand brake, and no operative horn or other audible signal. Plaintiff also contended that it was the duty of two officers of D & J Produce to inspect and maintain the vehicle in a safe operating condition and further contended that the two officers dispatched the truck driver in a vehicle they knew or should have known was not in a safe operating condition. The trial court dismissed the two officers pursuant to a Civ. R. 56 motion, but the court of appeals reversed, holding that the summary judgment was improperly granted in favor of the two officers who therefore remained as defendants. In the third paragraph of the syllabus, which is faithful to the law of the case, it is stated:

"A corporate officer is individually liable for injuries to a third party when the corporation owes a duty of care to the third person, the corporation delegates that duty to the officer, the officer breaches that duty through personal fault (whether by malfeasance, misfeasance, or nonfeasance), and the third person is injured as a proximate result of the officer's breach of that duty."

We find assignment of error five well-taken.[7]

---

[5] As noted in our discussion of the assignment challenging the dismissal of claims against the city, the trial court did not reach the question of whether the city was legally vulnerable for an award against it of punitive damages. Likewise, the issue of the possibility of the recovery of punitive damages from the directors (now returned to the Coliseum litigation), was not addressed by the trial court and is not an issue before us in this appeal. In his letter opinion sent to appropriate counsel, the trial judge explained thus: "Since the court's ruling on the first part of the motion excuses the directors, it is not necessary to rule on the question of punitive damages."

[6] In finding authoritative headship we refer to substance, not to form or style which we do not presume to evaluate.

[7] The issue of recoverability of punitive damages from Brian Heekin was not demonstratively developed or decided in the trial court and is not an issue before this court in this appeal. Brian Heekin's motion for sum-

## III

We return to consider the second assignment of error. It alleges that:

"The trial court erred in rendering partial summary judgment in favor of all defendants on the plaintiffs' claim for wanton and reckless misconduct."

In other words, the appellants' remonstration in this assignment attacks the granting of partial motions for summary judgment in favor of certain of the defendants on the issue of punitive damages. As already referenced in this decision, the issue of recoverability of punitive damages from the city, from the directors or Brian Heekin is not before us in this appeal.

Fortunately, the Supreme Court has recently considered the issue raised by this assignment, viz., what facts are sufficient to raise a jury question of punitive damages. Actually, the assignment narrows the issue for us considerably since the challenge therein is to the granting of a summary judgment favoring certain defendants and finding as a matter of law that punitive damages are not recoverable from them. The case referred to is *Detling* v. *Chockley* (1982), 70 Ohio St. 2d 134 [24 O.O.3d 239], and it is most valuable in resolving this assignment. We quote below from the unanimous opinion extensively although regretting the consumption of space thus involved in view of the already lengthy scope of this decision.

"The rationale for allowing punitive damages has been recognized in Ohio as that of punishing the offending party and setting him up as an example to others that they might be deterred from similar conduct: 'The principle of permitting damages, in certain cases, to go beyond naked compensation, is for example, and

the punishment of the guilty party for the wicked, corrupt, and malignant motive and design, which prompted him to the wrongful act,'[8] *Simpson* v. *McCaffrey* (1844), 13 Ohio 508, 522. See, also, *Rayner* v. *Kinney* (1863), 14 Ohio St. 283, 286-287; *Smith* v. *Pittsburg, Ft. W. & C. Ry. Co.* (1872), 23 Ohio St. 10, 18; *Railroad Co.* v. *Hutchins* (1881), 37 Ohio St. 282, 294. This form of civil punishment may be imposed even though the defendant may have been punished criminally for the same wrong. *Roberts* v. *Mason, supra,* paragraph one of the syllabus.

"The operative concept in Ohio which permits the awarding of punitive damages is, in addition to fraud or insult, malice, *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456, 471. Early reported cases defined malice only by comparison to juxtaposed synonyms: 'wrongful intention,' *Rayner* v. *Kinney, supra,* at page 287; 'fraud, malice and other willful wrong,' *Smith* v. *Pittsburg, Ft. W. & C. Ry. Co., supra,* at page 18; 'wrongful act [that] was wanton or otherwise aggravated * * * willful, wanton or malicious,' *Railroad Co.* v. *Hutchins, supra,* at page 294. More recent cases, however, have analyzed the malice requirement in terms of express or actual malice, *Mauk* v. *Brundage* (1903), 68 Ohio St. 89, and legal or implied malice, *Flandermeyer* v. *Cooper* (1912), 85 Ohio St. 327.

"Actual malice is required for a question of punitive damages to be submitted to a jury. *Smithhisler* v. *Dutter* (1952), 157 Ohio St. 454 [47 O.O. 334], paragraph one of the syllabus; *Pickle* v. *Swinehart* (1960), 170 Ohio St. 441 [11 O.O.2d 199], paragraph two of the syllabus. Actual

---

mary judgment sought a plenary dismissal which he was awarded; the motion did not mention punitive damages. Thus, Brian Heekin remains in the Coliseum litigation to confront plaintiffs' claims.

[8] "Other theories supporting punitive

damages include reimbursement for the plaintiff's noncompensable injuries and encouragement of private prosecution where there is no appropriate punitive device in the criminal law. See Freifield, The Rationale of Punitive Damages, 1 Ohio St. L.J. 5." *Detling* v. *Chockley,* 70 Ohio St. 2d at 136, fn.

malice is ' " 'that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other persons.' " ' *Columbus Finance* v. *Howard* (1975), 42 Ohio St. 2d 178, 184 [71 O.O.2d 174]. The court recognized, however, 'that it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances. One who has committed an act would scarcely admit that he was malicious about it, and so, necessarily, malice can be inferred from conduct.' *Davis* v. *Tunison* (1959), 168 Ohio St. 471, 475 [7 O.O.2d 296].

"As pointed out by the court in *Pickle* v. *Swinehart, supra,* paragraph one of the syllabus, '[t]he terms "legal malice" and "actual malice" are not synonymous.' 'Hatred, ill will or actual malice towards the injured party is not a necessary ingredient of legal malice as applied to torts, nor is it necessary that the act complained of proceed from a spiteful, malignant or revengeful disposition. If it be wrongful, unlawful and intentional and the natural and probable result of the act is to accomplish the injury complained of, malice is implied,' *Flandermeyer* v. *Cooper, supra,* paragraph three of the syllabus.

"Additionally, concepts of recklessness, wantonness, willfulness and grossness are inferred from the conduct and surrounding circumstances to support an award of punitive damages in tort actions. *Columbus Finance* v. *Howard, supra,* at page 184; *Rubeck* v. *Huffman* (1978), 54 Ohio St. 2d 20, 23 [8 O.O.3d 11]. '* * * [T]he conduct of a party may be either "wanton" or "reckless" and still not have been actuated by malice or ill will. And in the concept in which "wanton" is most frequently encountered — in the field of negligence * * * it is not necessary that there be ill will toward the person injured.' *Rogers* v. *Barbera* (1960), 170 Ohio St. 241, 244-245 [10 O.O.2d 248].

"Evidence of actual malice, therefore, must be present before a jury question of punitive damage is raised; actual malice may take either the form of the defendant's express ill will, hatred or spirit of revenge, or the form of reckless, wilful or wanton behavior which can be inferred from surrounding circumstances. * * *" *Id.* at 136-138.

Following this state's law on punitive damages and the standards of Civ. R. 56 mandated for resolution of motions for summary judgment, we hold as follows with respect to the involved defendants: We reverse the decisions below granting those partial summary judgments which dismissed punitive damage claims against the Coliseum, The Who and its four general partners, William Curbishley and Electric Factory Concerts. Initially we dispose of the punitive damage issue as to Tidal Wave Promotions, Inc. and Dalpepper Enterprises, Ltd.

Regarding Tidal Wave Promotions, Inc. ("Tidal Wave"), it negotiated a contract dated October 17, 1979, with the local promoter of The Who concert on December 3, 1979. One of the contract's provisions established a sound check for "approximately 6:00 p.m." on the night of the incident. On the face of it, there is nothing improper with scheduling a sound check for 6:00 p.m. What is material in the sequence of events is whether The Who's tardy arrival, a fact demonstrated in the record, was causally related to the tragedy. There is no indication that Tidal Wave's involvement extended beyond the contract referenced above. For example, there is no evidence that a Tidal Wave employee or agent was present on the scene. Finding no genuine issue of material fact as to Tidal Wave's participation which would amount to reckless, wilful or wanton behavior, we affirm the trial court's dismissal of Tidal Wave as to punitive damage liability.

We affirm also as to Dalpepper Enterprises, Ltd. because we find nothing in the record which would amount to a genuine issue of material fact of any such involvement in The Who concert as would

amount to reckless, wilful or wanton behavior. It was properly dismissed below as to punitive damage liability.

So far as the Coliseum's liability for punitive damages is concerned, the record is replete with an awareness by its officers and employees of the safety problems presented by large and uncontrolled crowds at rock concerts at the Coliseum prior to December 3, 1979. See depositions of Richard D. Morgan, Director of Operations at the Coliseum, Cincinnati Police Lt. Dale Menkhaus, and Brian Heekin. Moreover, the record contains communications sent by past rock concert patrons to Coliseum officials sounding danger signals for similar future events if solutions to the problems were not implemented. The letters were answered by the Coliseum's Director of Public Relations, John Patrick Tafaro. This correspondence is included as exhibits attached to his deposition. Therefore, a jury question of punitive damages is raised, and the dismissal of the Coliseum as to such damages was erroneous.

What about the possibility of punitive damage recoverability from The Who, including the general partners Daltrey, Townshend, Entwhistle and Jones? The group arrived late for a sound check. See deposition of Lt. Dale Menkhaus. There is a genuine issue of material fact as to whether there is a causal connection between that development and the tardy opening of the Coliseum doors and the ensuing deaths and injuries. Thus, the trial court erred by dismissing claims for punitive damages against The Who.

As personal manager for The Who, William Curbishley was on the scene on December 3, 1979, and had the responsibility for contacts between The Who and others implicated in the concert. According to one of The Who partners, Roger Daltrey, Curbishley had the authority, so far as The Who was concerned, to approve festival seating. In his deposed testimony Daltrey also recognized the possibility that Curbishley might have had authority on December 3, 1979 to decide how many entrance doors would be open and when. A jury question as to punitive damages exists for Curbishley.

Lastly, the motion of defendant Electric Factory Concerts ("EFC") for partial summary judgment on punitive damages was erroneously granted. EFC, a partnership, is a promoter of various events, maintains an office in the Coliseum, and was the promoter of the concert at the Coliseum on December 3, 1979. On October 17, 1979, EFC and the Coliseum executed a written instrument termed "Permit" by which the Coliseum granted permission to EFC to use and occupy its arena on December 3, 1979, from 8:00 p.m. until 11:00 p.m. Under the provisions of the "Permit," the Coliseum reserved many prerogatives to itself, but also awarded certain functions to EFC — and some authority they shared. For instance, provision 4(d) of the "Permit" provided:

"Permittee [EFC] shall have in attendance, at Permittee's cost, a prescribed number of security and safety personnel, the exact number and suitability to be determined by the Coliseum and, if necessary, such determination shall be made after Coliseum's consultation with the City Police and Fire Department."

The "Permit" strikingly evidences the meaningful promotional role of EFC in The Who show on the subject date.

Charles A. Levy, who went by the name of "Cal" Levy, was general manager and office manager for EFC at the time of the 1979 disaster. Levy was present at the Coliseum on December 3 at the concert in his capacity of general manager and actively oversaw the entire panorama for his employer EFC. The deposition in the matter *sub judice* tends to demonstrate that Levy was a key person in the determination of when the doors would open on the night of the concert. For instance, Richard D. Morgan of the Coliseum officialdom stated the following in his deposition:

"Q. [By attorney] What did you say to Cal Levy, though?

"A. [Morgan] I didn't really say anything to Cal Levy when we went down. Dale Menkhaus (Cincinnati Police lieutenant] and I then left our office, walked out through the office and walked downstairs, ran into Cal Levy looking for Larry Magid. I said to Dale, 'Let's go down and tell Magid how important' — I said, 'The boss of the Electric Factory, Larry Magid, is here. Let's go downstairs and tell him how important you feel the early opening of the doors is.' He said —

"Q. You agreed with him about the opening of the doors early, didn't you?

"A. I would have liked to have seen the doors open early, yes sir. But we went downstairs.

"Q. You would have liked to see them open at 6:30?

"A. Yes, sir. Went downstairs. They have a little dressing room which they use as an office, Electric Factory, and we went in there, and I said, 'Cal, is Larry Magid here?'

"He said, 'No, he is up eating.' And about that — so Dale said something like, 'Jesus, it would be nice if we could get those doors open earlier,' or 'at 6:30,' something like that. Did you want me to continue?

"Q. Please go ahead.

"A. Cal kind of grabbed Menkhaus by the shoulder like that (demonstrating) and said, 'Dale, you know how the act is. You know they'd freak out.'

"Q. What was that a reference to?

"A. 'Freaking out' in the rock show means that the act would get all upset, perturbed.

"Q. By what?

"A. By someone being in there and seeing them doing their sound check or something like that, by the public seeing them on stage doing their sound check and that they would get all bent out of shape or might cause some additional problems.

"Q. There is nothing about that sound check that requires that it occur after 6:30, is there?

"A. Say that again.

"Q. There is nothing about the carrying out of sound check that requires that it not occur until after 6:30?

"A. If everything was ready, it probably would have occurred at 4:30.

"Q. If Mr. Levy had it ready at 6:00, there would be reason why it didn't occur at 6:30, is that right?

"A. If it was ready, you could have it done, yes, sir.

"Q. Provided they showed up to do it?

"A. Yes, sir."

As heretofore expressed, there remain genuine issues of material fact as to whether the claims against EFC for punitive damages are meritorious.

Resultantly, assignment two is sustained in part and overruled in part. With respect to this assignment, the summary adjudication below in favor of Tidal Wave and Dalpepper Enterprises was proper; the other summary adjudications were not.

IV

After the trial court in its December 23, 1982 order dismissed the city, the Coliseum directors and Heekin, certain cross-appeals were filed. In other words, the Coliseum, its board members, Heekin, the entire The Who (Daltrey, Townshend, Entwhistle, Jones, Curbishley, Tidal Wave and Dalpepper) and EFC wanted to protest the dismissal of the city. Thus, there are a number of appeals challenging that dismissal. Furthermore, the city became restive when the trial court dismissed members of the Coliseum board and Heekin, and it (city) cross-appealed arguing the following (from the city's brief):

"If the City of Cincinnati, Brian Heekin and the board of directors of Cincinnati Riverfront Coliseum once again become co-defendants in the Hamilton County Court of Common Pleas the City

of Cincinnati should be able to pursue its cross-claim for indemnity and contribution against Brian Heekin and the board of directors of Cincinnati Riverfront Coliseum."

We hold that the cross-appeals remonstrating against dismissal of the city are well-taken, but as explicated above in some detail the dismissal is cogent only on the theory of possible negligence and not on nuisance or a civil rights violation. Furthermore, the city's cross-appeals as to the board and Brian Heekin similarly are well-taken. We note parenthetically that it is somewhat puzzling as to why the Coliseum cross-appealed against the city since the trial court's order of December 23, 1982 did not dismiss the Coliseum's cross-claim against the city although it dismissed all other cross-claims against the city. Regardless of the apparent needlessness of the cross-appeal by the Coliseum, its circumscribed cross-claim against the city is viable. Thus, the various assignments of error which attend the cross-appeals are sustained. (Incidentally, these particular assignments, located randomly throughout the myriad briefs, are somewhat depthlessly presented.)

## V

In summary, our holdings with respect to the liability of the various parties follow. These recapitulations below are to be credited only as they correspond to elucidative subject matter in this decision proper.

1. We reverse the order of the trial court dismissing punitive damage claims against the Cincinnati Riverfront Coliseum, Inc.

2. We reverse a similar order dismissing punitive damage claims against The Who, Daltrey, Jones, Entwhistle, Townshend and Curbishley.

3. We affirm the order below dismissing punitive damage claims against Tidal Wave Promotions, Inc. and Dalpepper Enterprises, Ltd.

4. We reverse the order below dismissing punitive damage claims against Electric Factory Concerts.

5. We reverse the order of the trial court dismissing all claims against members of the board of directors of the Coliseum and its President, Brian Heekin.

6. We reverse the dismissal of all claims by plaintiffs against the city of Cincinnati insofar as they sound in negligence.

7. We affirm the dismissal of all claims by plaintiffs against the city insofar as they sound in nuisance or a violation of civil rights.

8. We reverse the trial court's dismissal of all cross-claims against the city except as in 9, *infra*.

9. We affirm that portion of the trial court's order which preserves the claim of the Coliseum against the city.

10. The city's cross-claims for possible indemnification and/or contribution against the board of directors individually and Brian Heekin remain viable.

*Judgment accordingly.*

KEEFE, P.J., DOAN and KLUSMEIER, JJ., concur.