Stephen A. **LAMBERT**, et al., Plaintiff,

v.

Austin **KAZINETZ**, et al., Defendants.

No. 02–CV–362.

United States District Court,
S.D. Ohio,
Eastern Division.

March 12, 2003.

Dennis E Murray, Jr., Murray & Murray, Sandusky, OH, for Plaintiffs.

Murray Hudson, The Law Offices of Murray, Boca Raton, FL, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on the Defendants' Motion to Dismiss the Plaintiffs' Complaint. The Plaintiffs, Stephen A. Lambert, American Mortgage Solutions, Inc., and AMS Commercial, LLC, assert four claims against the Defendants, Austin Kazinetz and American Financial Network, Inc. On August 13, 2002, the Defendants filed a Motion to Dismiss the Plaintiffs' Complaint.

For the following reasons, the Court **DENIES** the Defendants' Motion to Dismiss.

## II. BACKGROUND

The following facts are set forth in the Plaintiffs' Complaint.

Plaintiff Stephen Lambert is the incorporator and president of Plaintiff American Mortgage Solutions, Inc. ("American Mortgage"), and the sole member of Plaintiff AMS Commercial, LLC ("AMS"). American Mortgage and AMS were in the business of originating, purchasing, and acquiring mortgages and other types of loans for later sale, transfer, exchange, or investment. Defendant Austin Kazinetz is the Chief Executive Officer and Secretary of Defendant American Financial Network, Inc. ("AFN"). AFN engages in the same business as American Mortgage and AMS.

In January 2000, Defendant Kazinetz approached Plaintiff Lambert and proposed a transaction to combine three companies: AMS, AFN, and a third corporation, Fairway Mortgage ("Fairway"). According to the proposal, AFN would purchase the assets of AMS and Fairway. Then, upon completion of that transaction, the newly formed corporation would acquire First Chesapeake, a public company with an existing mortgage division. The Plaintiffs allege that this transaction never was finalized because Defendant Kazinetz failed to sign the necessary paperwork. Following the failure of this initial transaction, Fairway and AMS discussed completing the transaction without AFN. That effort was abandoned, however, after AFN notified the parties that it would enforce a non-circumvention agreement among the parties if Fairway and AMS attempted to complete any transaction without it.

Subsequently, First Chesapeake issued a letter of intent to purchase the assets of AMS on September 8, 2000, but encountered difficulty raising the capital necessary to complete the transaction as contemplated. In November 2000, Kazinetz approached AMS with a new proposal and asked Lambert to delay the First Chesapeake deal until he had considered AFN's new proposal. Kazinetz represented to Lambert that he had sufficient capital, as well as a software package that would be advantageous to an entity resulting from the combination of AMS and AFN. Kazinetz also indicated that AFN had the necessary financial backing of an investor to complete an asset purchase from AMS. This investor, whom Lambert later learned to be ABRIC, a publicly-traded foreign corporation, would ultimately purchase the combined company.

During the continued negotiations between Defendant Kazinetz and AMS, another company, Home Financing Centers, Inc. ("Home Financing"), approached AMS and expressed an interest in purchasing its business. Home Financing offered cash and stock for the purchase of AMS. Due to the representations made by Kazinetz, Lambert did not pursue offers from either First Chesapeake or Home Financing.

By mid-January 2001, the terms of the asset purchase transaction between AMS and AFN were established. AFN agreed to pay Lambert $200,000 in cash for substantially all of the assets and business of AMS. AFN also agreed to employ all key AMS employees, including Lambert. In particular, Lambert was promised a salary, employee benefits and commissions totaling approximately $500,000 the first year, with increases thereafter.

In mid-January, pursuant to a request made by Kazinetz, AMS purchased six stale loans [1] that were on AFN's ware-

---

1. These loans were originally intended for resale to specific investors, but became unsell-

house credit line. These six stale loans were impairing AFN's ability to utilize the full line of credit and, therefore, also depressing AFN's profitability. Kazinetz stated that, if left unaddressed, the stale loans threatened to precipitate litigation, which would, in turn, jeopardize financing for the AMS/AFN deal. In a letter to AMS that was signed by Kazinetz and dated January 22, 2001, AFN agreed to take back these stale loans if AMS could not resell them or remove them from AMS' credit line within forty-five days. The loans were never repurchased by AFN.

After AMS assumed these stale loans, Defendants delayed implementation of the AMS asset purchase until mid-February 2001. AFN then agreed that it would assume the payroll obligations for AMS employees starting February 19, 2001. AFN further agreed, effective March 1, 2001, that it would assume all of AMS' office and other expenses, and that it would receive the proceeds of all loans that closed after that date. Pursuant to this agreement, Lambert arranged for the transfer of AMS office and equipment leases to AFN. Lambert also told vendors, investors, and other business contacts that AMS would be purchased by AFN. In addition, Lambert and Kazinetz agreed to close the Cleveland office of AMS at the end of February 2001.

Although Lambert arranged to have all of AMS' lease and rental agreements transferred to AFN in February 2001, Kazinetz refused to sign agreements to accept most of the lease transfers. The only lease AFN assumed was the rental agreement for office space in Chicago. After signing that lease, AFN failed to return AMS' security deposit to the Plaintiffs.

In February 2001, Kazinetz agreed to provide AMS $10,000 to cover some expenses of the Chicago and Columbus offices for that month. AFN never paid these expenses.

On the agreed transaction date of March 1, 2001, AFN was not licensed to close loans in Illinois, and continued to utilize AMS' license and lines of credit to do business and pay commissions to the employees in the Chicago office. AFN used the telephone lines and ran credit bureau checks on AMS' accounts, but did not pay any of these expenses.

In April 2001, having not yet received any money for the asset purchase, Lambert began questioning Kazinetz about the status of the transaction. Lambert discovered that Kazinetz had not provided all of the information ABRIC's auditors required to finance the transaction. ABRIC agreed to pay funds to AFN within ten to fifteen days after receipt of all of the information. Lambert offered assistance in gathering the necessary information, but Kazinetz instead asked Lambert to sell eight more stale loans on AFN's credit line. Lambert agreed and found buyers for the eight stale loans. In addition, AMS found buyers for the six stale loans it had previously assumed in January. AFN sold eight loans in its name, but did not sell the six stale loans that remained on AMS' credit line. Instead, AFN prevented the sale of the six stale loans on AMS' credit line by telling the potential investors that AMS was bankrupt.

According to the Plaintiffs, AFN received all of the income from AMS' operations beginning in March 2001. AFN also continued to use AMS' credit and licenses to conduct business until early April. AFN, however, did not make any payments on the AMS' expenses, nor did it make payments for the use of AMS accounts.

able to those investors for reasons unknown to the Plaintiffs.

Lambert ultimately came to believe that Kazinetz had no intention of honoring the asset purchase agreement. He attempted to meet with Kazinetz, but was refused. Then, on May 8, 2001, Kazinetz summarily issued an order firing every employee in AMS' Columbus office. On the same date, Kazinetz called the Chicago office and ordered employees in that office to convert anything that remained in AMS' name to AFN's name. After employees in the Chicago office refused AFN's request, AFN closed the Chicago office and set up a new office in Chicago through Mark Zator, a former AMS office manager. Zator took control of all the AMS customer files in Chicago and closed pending loans in AFN's name.

Relying on the Defendants' prior representations regarding the asset purchase agreement, AMS allowed its licenses to conduct businesses to lapse. AMS subsequently became re-licensed in Ohio, but asserts that it is no longer a viable business entity because of the debt and bad credit that it has incurred allegedly as a result of AFN's actions.

Based on the foregoing, Lambert, Mortgage Solutions, and AMS filed a Complaint with this Court on April 19, 2002, against Kazinetz and AFN. In the Complaint, the Plaintiffs assert the following causes of action: (1) fraud; (2) promissory estoppel; (3) tortious interference with business relations; and (4) deceptive trade practices in violation of Ohio Rev.Code section 4165.01 *et seq.* This matter is now before the Court on the Defendants' Motion to Dismiss Plaintiffs' Complaint.

## III. STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, this Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.

1983). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 724 (6th Cir.1996). The Court must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Lillard,* 76 F.3d at 724 (quoting *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994)).

While the complaint need not specify every detail of a plaintiff's claim, it must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gazette,* 41 F.3d at 1064. While liberal, this standard of review does require more than the bare assertion of legal conclusions. *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993) (citation omitted). A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 437 (6th Cir.1988).

## IV. ANALYSIS

### A. Kazinetz's Personal Liability

The Defendants seek a dismissal of the claims asserted against Kazinetz in his individual capacity, asserting that there is no basis upon which to hold him individually liable for the acts of AFN.

A corporation is a legal entity that exists separate and apart from its officers, directors, and shareholders. *Zimmerman v. Eagle Mortgage Corp.,* 110 Ohio App.3d 762, 675 N.E.2d 480, 485 (1996) (citations omitted). Generally,

shareholders, officers and directors of the corporation are not held liable for the debts or actions of this separate legal entity. *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Co., Inc.,* 67 Ohio St.3d 274, 617 N.E.2d 1075, 1085 (1993) (citing Presser, Piercing the Corporate Veil 1–4 (1991)). The corporate veil can be pierced, however, to hold an individual corporate officer or shareholder liable for the wrongs committed by a corporation under certain circumstances. In particular, the corporate veil can be pierced when: (1) the individual to be held liable exerted such complete control that the corporation has no separate mind, will, or existence of its own; (2) control was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Id.* at 1086.

The Defendants argue that the Plaintiffs' Complaint does not plead sufficient facts to pierce the corporate veil. First, the Defendants contend that, even according to the Plaintiffs' version of the facts, Kazinetz did not exert such complete control over AFN that the two were fundamentally indistinguishable. Rather, like other individuals associated with AFN, Kazinetz was simply one officer of this corporate entity who acted as an agent thereof. Second, the Defendants contend that Kazinetz did not exercise control over AFN with the purpose of committing fraud or an illegal act against the Plaintiffs.

The Plaintiffs, however, argue that the facts alleged support a finding that Kazinetz can be held personally liable on the claims asserted. They point out that the doctrine of piercing the corporate veil was not intended to be used as a shield to immunize all corporate officers or shareholders from personal liability for their own misdeeds. As such, the Plaintiffs argue that, under Ohio law, corporate officers or shareholders may be personally liable for the torts they commit in their corporate capacity. *Heritage Funding & Leasing Co. v. Phee,* 120 Ohio App.3d 422, 698 N.E.2d 67, 73 (1997); *see Bowes v. Cincinnati Riverfront Coliseum, Inc.,* 12 Ohio App.3d 12, 465 N.E.2d 904, 911 (1983) (recognizing that corporate officers may be held personally liable in tort). Therefore, the Plaintiffs assert that Kazinetz may be held liable for the torts he personally committed while acting as an agent of AFN.

■ The Defendants may be correct that the circumstances presented here do not justify piercing the corporate veil under the standard set forth in *Belvedere.* The Defendants' argument, however, that if the corporate veil cannot be pierced, then Kazinetz cannot be held personally liable, misses a key distinction between corporate law and the law of agency. *See Yo–Can, Inc. v. The Yogurt Exch., Inc.,* 149 Ohio App.3d 513, 778 N.E.2d 80, 90 (2002) (citing *Krieger Ford, Inc. v. Chase Motors, Inc.,* No. 98AP–982, 1999 WL 561693, at *8 (Ohio App. Aug. 3, 1999), for the proposition that the personal liability of a corporate officer does not depend on the same grounds as piercing the corporate veil). The basis for the Plaintiffs' claims against Kazinetz is not simply that he may be liable for the acts of the corporation because of his position as an officer and shareholder. Rather, the Plaintiffs assert claims against Kazinetz because he personally engaged in the allegedly tortious conduct that forms the basis for those claims.

■ As the Plaintiffs correctly point out, corporate officers may be held liable for the torts they commit while acting within the scope of their employment. *Cent. Benefits Mut. Ins. Co. v. RIS Adm'rs Agency, Inc.,* 93 Ohio App.3d 397, 638 N.E.2d 1049, 1053 (1994) ("When a corporate officer commits a tort while in

the performance of his duties, he is individually liable for the wrongful act.") (internal quotation omitted); *Atram v. Star Tool & Die Corp.*, 64 Ohio App.3d 388, 581 N.E.2d 1110, 1113 (1989) (citation omitted). Indeed, if an agent commits a tort in the course of his agency, "the fact of agency will not relieve him of liability, and this is so even though the principal may be liable also." *Atram*, 581 N.E.2d at 1113 (internal quotation omitted); *see Lepera v. Fuson*, 83 Ohio App.3d 17, 613 N.E.2d 1060, 1064 (1992) ("A tort victim is entitled to recover from the agent as well as the principal for fraudulent misstatements made by the agent in the course of his employment.") (citing *Stuart v. Nat'l Indem. Co.*, 7 Ohio App.3d 63, 454 N.E.2d 158 (1982)). Thus, Kazinetz cannot shield himself from liability for the conduct in which he allegedly engaged merely because he engaged in that conduct as a corporate officer; the fact that the Plaintiffs may not be able to pierce the corporate veil is irrelevant to the issue of Kazinetz's personal liability for his own conduct. *See Yo–Can, Inc.*, 778 N.E.2d at 91 (recognizing that plaintiffs need not pierce the corporate veil to hold corporate officers liable for the allegedly fraudulent conduct in which they personally engaged).

Therefore, the Court **DENIES** the Defendants' Motion to Dismiss claims brought against Defendant Austin Kazinetz in his personal capacity.

### B. Fraud

■ The Plaintiffs assert that the Defendants engaged in fraud by entering into agreements with the Plaintiffs with no intention of fulfilling them, and by making false representations to the Plaintiffs.

The Defendants argue that the fraud claim must be dismissed because the Plaintiffs have failed to plead that claim with the particularity required by Federal Rule of Civil Procedure 9(b). In particular, they state that the Plaintiffs have neither set forth the allegedly fraudulent statements, nor have they specified which individuals made the statements. The Defendants also note that the Plaintiffs have not stated precisely when or where the allegedly fraudulent statements were made. The Plaintiffs, on the other hand, argue that the Complaint is sufficient because it gives proper notice to the Defendants of the basis for the fraud claim.

■ Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead common law fraud claims with particularity. In particular, Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.P. 9(b). To satisfy this requirement, the Plaintiff must " 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the Defendant; and the injury resulting from the fraud.' " *Coffey v. Foamex*, 2 F.3d 157, 161–62 (6th Cir.1993) (quoting *Ballan v. Upjohn Co.*, 814 F.Supp. 1375, 1385 (W.D.Mich.1992)). Rule 9(b) is to be read in conjunction with Rule 8(a), which requires that pleadings include "a short and plain statement of a claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a); *see Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988). "The threshold test is whether the complaint places the defendant on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way plaintiffs [sic] claim of fraud.' " *Coffey*, 2 F.3d at 162 (quoting *Brewer v. Monsanto Corp.*, 644 F.Supp. 1267, 1273 (M.D.Tenn.1986)).

The Court finds that the Plaintiffs' Complaint satisfies the particularity requirement of Rule 9(b) because it places the Defendants on sufficient notice of the basis for the fraud claim. In particular, the

Plaintiffs' Complaint alleges: (1) that, in mid-January, the Defendants agreed to purchase AMS and employ AMS' employees; (2) that, on January 22, 2001, the Defendants promised to repurchase six stale loans if they could not be resold by the Plaintiffs within forty-five days; (3) that the Defendants promised to assume the payroll responsibilities of all AMS employees as of February 19, 2001; (4) that the Defendants agreed to assume responsibility for office expenses of the former AMS offices, effective March 1, 2001; and (5) that, in February 2001, in Florida, Kazinetz told Lambert that AFN would pay AMS $10,000 to cover expenses for the Chicago and Columbus offices. The Complaint alleges that all of these statements, promises, and agreements were material to the asset purchase agreement, and were relied upon by the Plaintiffs when entering into the agreement, and when conducting their own business. The Complaint goes on to assert that the Defendants made these statements without intent to honor them and with disregard to their falsity. Finally, the Plaintiffs allege in their Complaint that their reliance on these statements caused them financial harm and the loss of their ability to operate as AMS.

In light of these specific allegations, the Court finds that the Complaint was pleaded with the particularity required by the Federal Rules of Civil Procedure. Indeed, the Complaint set forth: (1) the content of the misrepresentations; (2) the period of time during which those misrepresentations were made; and (3) the location where the misrepresentations were made. Thus, the Complaint adequately places the Defendants on notice of the basis for the claim against them, thereby allowing the Defendants to answer the fraud claim in an informed way.

Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiff's claim of fraud.

## C. Promissory Estoppel

▮▮▮ The Plaintiffs assert that the Defendants are liable for the Plaintiffs' business losses under a theory of promissory estoppel. In certain circumstances, the doctrine of promissory estoppel can be applied "to enforce a promise that does not meet the criteria of a formal contract." *Healey v. Republic Powdered Metals, Inc.*, 85 Ohio App.3d 281, 619 N.E.2d 1035, 1037 (1992). To state a claim for promissory estoppel, the plaintiff must allege: (1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) reasonableness and foreseeability of that reliance; and (4) injury by the party claiming estoppel. *Rigby v. Fallsway Equip. Co., Inc.*, 150 Ohio App.3d 155, 779 N.E.2d 1056, 1061 (2002) (citing *Healey*).

▮▮▮ The Defendants argue that the promissory estoppel claim asserted by the Plaintiffs must be dismissed for the Plaintiffs' failure to allege the existence of any clear and unambiguous promise made by the Defendants. The Court, however, finds that the Plaintiffs have properly alleged that the Defendants made certain clear and unambiguous promises that form the basis of this claim. In particular, the Plaintiffs assert that the Defendants promised that they would: (1) pay the Plaintiffs $200,000 for the assets of AMS; (2) pay the office expenses of AMS; and (3) repurchase six stale loans after forty-five days. Moreover, with respect to these alleged promises, the Plaintiffs have properly pleaded all of the other elements of a claim for promissory estoppel.[2] In particular,

---

**2.** The Defendants have not challenged the Plaintiffs' promissory estoppel claim on any grounds other than the Plaintiffs' alleged failure to plead a clear and unambiguous promise by the Defendants.

the Plaintiffs assert that they relied on the Defendants' promises, that such reliance was both reasonable and foreseeable, and that their reliance on the promises caused injury in the form of lost business opportunities and the ability to continue operating as AMS. These allegations are sufficient to state a cause of action for promissory estoppel.

 In addition, the Plaintiffs state a claim for promissory estoppel based on their assertion that the Defendants promised to employ Lambert for the foreseeable future, but then terminated him from employment when they terminated all other employees in the Columbus office. In Ohio, although most employment is at-will, an exception to the employment at-will doctrine exists when promises have been made to the employee that fall within the scope of promissory estoppel. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150, 154 (1985). In determining whether an employer's promise regarding employment brings a particular case within the exception to the employment at-will doctrine, the Court is to examine "whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." *Id.* at 155. Lambert alleges that the Defendants should have anticipated that he would rely on their representation that he would be employed for the foreseeable future. He avers that, in fact, he did rely on Defendants' promise of employment to his detriment, believing that he would be employed with AFN for a period of time significantly longer than the period of time he was actually employed by AFN. Accordingly, the Plaintiffs have stated a claim for promissory estoppel based on this alleged promise of employment, as well.

Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiffs' claim of promissory estoppel.

## D. Tortious Interference with Business Relations

 The Plaintiffs claim that the Defendants engaged in tortious interference with their business relations. Tortious interference with business relationships occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another...." *A & B–Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 651 N.E.2d 1283, 1294 (1995). A claim for tortious interference with a business relationship is not cognizable where the interference results as a mere consequence of a breach of contract. *Digital & Analog Design Corp. v. N. Supply Co.*, 44 Ohio St.3d 36, 540 N.E.2d 1358, 1368 (1989) (recognizing that, "though a breach of a duty under a contract or lease necessarily interferes with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference") (citations omitted).

The Defendants argue that the Plaintiffs have not stated a cognizable claim of tortious interference with a business relationship because the alleged interference resulted directly from a breach of a contract, the asset purchase agreement. The Defendants also assert that the claim must fail because the Plaintiffs have not identified the prospective business relationship with which the Defendants allegedly interfered.

Contrary to the Defendants' arguments, the Court finds that the Plaintiffs have pled sufficient facts to state a claim for tortious interference with business relations. The Plaintiffs assert that the De-

fendants attempted to convert pending loans in the name of AMS to AFN. In addition, the Complaint alleges that Mark Zator, a former AMS office manager, was persuaded to work for AFN, and appropriate AMS' customer lists and other proprietary information. Further, the Plaintiffs contend that the Defendants made false and misleading statements to potential investors by telling them that AMS was bankrupt. The Defendants' alleged actions constitute attempts to induce third parties not to enter into or continue their business relations with the Plaintiffs. Furthermore, this conduct goes beyond the mere alleged breach of the asset purchase agreement. Accordingly, the Plaintiffs' allegations are sufficient to state a cause of action for tortious interference with business relations.

Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiffs' claim of tortious interference with business relations.

### E. Deceptive Trade Practices

█ The Plaintiffs, in their fourth and final cause of action, assert that the Defendants engaged in deceptive trade practices, in violation of the Ohio Deceptive Trade Practices Act, Ohio Rev.Code section 4165.01 *et seq.* The Ohio Deceptive Trade Practices Act states that an individual engages in a deceptive trade practice when he:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

. . . . .

(10) Disparages the goods, services or business of another by false representation of fact.

OHIO REV.CODE section 4165.02(A).

The Defendants argue that the Plaintiffs' claim of deceptive trade practice must be dismissed because a claim of deceptive trade practice must be premised upon a false representation of fact. *Northeast Ohio Coll. of Massotherapy v. Burek,* 144 Ohio App.3d 196, 759 N.E.2d 869, 876 (2001). Thus, the Defendants contend that the claim fails because the Plaintiffs fail to allege that the Defendants made any false statement of fact. Furthermore, the Defendants maintain that there can be no deceptive trade practice because the Plaintiffs allowed the Defendants to control and direct all of the business of AMS. Finally, the Defendants argue that, even if the Plaintiffs have stated a cause of action under Ohio law, the allegation of deceptive trade practice in the Chicago office must be dismissed for lack of subject matter jurisdiction because the Ohio Deceptive Trade Practices Act does not extend to claims of misconduct that occurred outside the boarders of Ohio.

The Court finds that the Plaintiffs have alleged sufficient facts to state a cause of action for deceptive trade practice. Plaintiffs assert a claim for violation of Ohio Rev.Code section 4165.02(A)(1) when they state: (1) that the Defendants passed off AFN services as those of AMS; (2) that AFN continuously used AMS' credit and accounts, thereby causing a likely confusion as to AFN's affiliation or connection to AMS; and (3) that AFN told AMS' customers that AMS was bankrupt when, in fact, it was not. The Court notes that the Defendants read *Burek* more broadly than is appropriate under the facts of that case. Although *Burek* states that a claim for deceptive trade practice requires a false representation of fact, the claim in

that case was brought only under Ohio Rev.Code section 4165.02(A)(10), which explicitly requires a false representation of fact. *Burek*, 759 N.E.2d at 876. Here, however, the Plaintiffs also assert claims under sections 4165.02(A)(1), (2), and (3).

█ Moreover, the Defendants have failed to provide any case law in support of their assertion that the Court lacks subject matter jurisdiction over the alleged deceptive trade practice that occurred in Chicago, Illinois. This lack of support is likely due to the fact that Ohio courts have indicated that individuals may violate the Ohio statute through conduct that occurs outside the state's borders. *See Cesare v. Work*, 36 Ohio App.3d 26, 520 N.E.2d 586, 596–97 (granting a nationwide injunction based on the defendants' violation of the Ohio Deceptive Trade Practices Act). In addition, the Court notes that much of the Defendants' alleged improper conduct in Chicago is inextricably linked to the alleged misconduct in which they engaged when conducting business in Ohio. Accordingly, the Court rejects the Defendants' argument that the Plaintiffs' claim for violation of Ohio Rev.Code section 4165.02 must be dismissed with respect to the conduct that occurred in Illinois.

Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiffs' claim for deceptive trade practices in violation of Ohio Rev.Code section 4165.02(A).

## V. CONCLUSION

Based on the foregoing analysis, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiffs' claims.

**IT IS SO ORDERED.**