DECISION.
{¶ 1} On January 28, 2000, plaintiff-appellee Capital Plus, Inc., ("Capital") sued defendants-appellants Troy Parker, d/b/a Imperial Distribution Company ("Imperial"), Parker Enterprises Imperial Distribution, Inc., Maid Service Systems, Inc., and Troy Parker individually (collectively, "Parker") for breach of contract, breach of guaranty, fraud, and foreclosure of pledged assets. After a five-day bench trial, the trial court entered judgment against Parker.
 {¶ 2} On appeal, Parker does not contest that he breached the contract with Capital, but he does take issue with the amount of damages awarded and the finding of fraud. Additionally, Parker argues that he was not personally liable for the damages because he did not sign a guaranty, nor did he enter into a contract with Capital on behalf of Imperial, a sole proprietorship.
 {¶ 3} Upon our review of the record, we hold that Parker fraudulently induced Capital to continue a financing relationship with Imperial, and that Parker, as guarantor of the companies and as the sole proprietor of Imperial, was personally liable for the damages resulting from that fraud. We also hold that there was some competent, credible evidence to support the amount of damages that was awarded. Accordingly, we affirm the judgment of the trial court.
 The Business Relationship {¶ 4} Imperial is a chemical distribution company owned by Parker. Imperial's only customer is International Paper ("IP"). Capital is a commercial lender owned and operated by Robert Setzer. Capital provided two types of financing to Imperial: it factored accounts receivable and provided purchase-order advances.
 {¶ 5} When Capital factored accounts receivable for a customer, it purchased invoices that were due to the customer from account debtors. In the factoring relationship at issue here, Capital purchased invoices that were due to Imperial from IP. Capital would advance 80% of the face amount of each invoice to Imperial and wait for payment from IP. Capital notified IP of the factoring relationship and directed IP to make checks payable to Imperial but to send the payments to Capital's lockbox in Columbus, Ohio. When Capital received payment, it would deduct the 80% it had advanced and its fees, which were based on the amount advanced and the number of days the account was outstanding, and then remit any difference to Imperial.
 {¶ 6} With purchase-order advances, Capital would simply advance money to Imperial so that it could purchase inventory to sell to IP. When Imperial would receive purchase-order invoices from IP, Imperial would transfer the invoices to Capital, who would use them to pay down the line of credit it had extended to Imperial. Thus, in purchase-order advances, Capital would eventually receive an invoice in the amount of the initial advance, but no new money would be advanced. This was somewhat confusing because purchase-order financing would be made to look like factoring accounts receivable in Capital's accounting records.
 The Contracts {¶ 7} There is considerable dispute about the formation and authenticity of the contracts that formed the relationship between Capital and Parker's businesses. Because of that dispute, we note that Capital had previously factored accounts receivable for Imperial Building Cleaning Services, Inc., another company owned by Parker. In order for Parker to have entered into that previous relationship, he had to execute a personal guaranty, a factoring agreement, an Exhibit B (a schedule of commissions and charges), and an Exhibit C (an acknowledgement and representation regarding misdirected payments). Setzer testified that Parker had to execute the same documents to enter into the relationship with Capital at issue here.
 {¶ 8} Before entering into that business relationship, Setzer informed Parker that he would have to incorporate Imperial. On the date of the execution of the contracts, Parker provided Setzer with a filed copy of the articles of incorporation for Parker Enterprises Imperial Distribution, Inc. ("Enterprises"). Because there were some invoices that predated the existence of Enterprises that Parker wanted to finance, Capital required that Parker execute two factoring agreements: one on behalf of Troy Parker, d/b/a Imperial, and one on behalf of Enterprises. Setzer and John Hopper, a Capital employee, both testified that Parker executed three original agreements for each company name. One of the originals was for Capital's file, one was for Parker's file, and one was to file with the Ohio Secretary of State pursuant to the Uniform Commercial Code ("UCC"). Setzer and Hopper also testified that Parker had executed a personal guaranty on behalf of Enterprises. But Parker denied executing (1) a guaranty on behalf of Enterprises; (2) Exhibit B and C to the Enterprises factoring agreement; and (3) a factoring agreement on behalf of Imperial.
 {¶ 9} Unfortunately, no originals of the contracts or the guaranty were produced at trial. Setzer testified that Capital had been unable to produce the original factoring agreements and guaranty because Parker had stolen them from Setzer's office. Setzer testified that Parker had been left alone in Setzer's office with the original files for approximately five minutes during a business meeting in the fall of 1999. After Parker had left the office, the originals could not be found. Setzer testified that he had employees search the offices and their cars for the original contracts. Setzer and Hopper testified that this was the first time in the 12-year history of the company that an original file had been missing. Parker was unable to produce originals of the agreements because, according to his testimony, a fire at his warehouse on December 31, 1999, had destroyed all of his records.
 {¶ 10} Capital did produce a copy of the Enterprises factoring agreement and the guaranty signed by Parker that it had found in another file. Capital also produced a copy of the Imperial factoring agreement, which it had obtained from the Ohio Secretary of State. This copy had originally listed the customer as Enterprises, but that had been crossed out and in its place "Parker d/b/a Imperial" had been typed. Hopper testified that Capital had employed a company called NCS to make its UCC filings, and that, in order to save money, he had only given a copy of the Enterprises agreement to NCS to file with the secretary of state. After NCS informed him that Enterprises did not exist or was not yet registered, Hopper authorized NCS to cross out Enterprises as the customer and type in "Parker d/b/a Imperial" in its place. Hopper explained that since there was an original of the "Parker d/b/a Imperial" agreement in Capital's file and because there was a power of attorney in both agreements, he thought the change would be acceptable.
 {¶ 11} Parker produced a copy of the Enterprises factoring agreement and a copy of the personal guaranty on behalf of Enterprises. (Parker had received a copy of the factoring agreement from Setzer during a previous business meeting.) Parker admitted that he had signed a factoring agreement on behalf of Enterprises, but he could not indicate which of the copies produced at trial bore an actual copy of his original signature.
 {¶ 12} Even though Parker testified to executing a factoring agreement on behalf of Enterprises, he admitted that he had never filed corporate taxes on behalf of Enterprises during the 1998 and 1999 fiscal years.
 The Guaranty(s) {¶ 13} The claim that Parker was personally liable for the funds owed to Capital was based partially on Parker's execution of a personal guaranty on behalf of Enterprises.
 {¶ 14} At trial, both Parker and Capital produced a copy of the same guaranty; Parker also produced a copy of an additional guaranty. The signature pages of the copy solely produced by Parker and the copy produced by Capital and Parker were different. On Parker's copy, the date of April 16, 1998, had been crossed out and replaced with August 20, 1998, with Hopper's initials above. Parker's address on this copy did not include his zip code but did include his apartment number. On Capital's copy, the date simply read August 1998 and the address included the zip code but not the apartment number for Parker. Despite these inconsistencies, Hopper, the person responsible for creating the factoring agreements and guaranty, testified that he had not changed or altered any documents, that he had created both of these copies of the guaranty, and that he had seen Parker execute the originals. Parker testified that Hopper was not present when he signed any documents. Setzer testified that Hopper was present.
 {¶ 15} In support of his argument that he had not signed the guaranty, Parker submitted the videotaped testimony of Steven Greene, a forged-document examiner for the Ohio Bureau of Criminal Identification and Investigation. Greene had been allowed to testify as an expert on forged documents in approximately 250 cases.
 {¶ 16} Greene was asked to review the signature page of the Enterprises factoring agreement (Exhibit 74), the signature page of Exhibit B to the factoring agreement (Exhibit 75) and the personal guaranty (Exhibit 76). All were copies. Parker testified that he had provided samples of his handwriting to Greene, but Greene testified that he had never asked for any samples, nor had he received any to review.
 {¶ 17} Based upon his examination of those three documents, Greene gave the following expert opinions: (1) that if it was assumed that Parker's signature on Exhibit 74 was genuine, Parker's signature on Exhibit 76 "[was] probably not genuine," and (2) that Parker's three signatures on the documents were "probably identical." Greene explained that it was impossible for a person to sign his name the same way twice, and thus that because all three of Parker's signatures were identical, the signature on Exhibit 76 must have either been cut and pasted or traced. Greene also explained that when he had used the term "probably" in his opinion, he meant "more likely than not," which would fall somewhere greater than 50% but less than 100%.
 {¶ 18} On cross-examination, Greened testified that it was possible that Exhibit 76 contained an original signature. Greene also examined a copy of the other guaranty that Parker had produced at trial (the one with the date crossed off and the new date written in with Hopper's initials) and concluded that Parker's signatures on each guaranty were not identical.
 The First Eight Months {¶ 19} Once the contracts were executed, Capital began factoring accounts for Imperial. Capital factored Imperial's accounts from August 1998 to August 1999, at which time it realized that Imperial had been fraudulently preparing invoices from IP in order to receive funds and that Imperial was unable to repay the debt.
 {¶ 20} At the beginning of the relationship, Setzer had communicated with IP's purchasing manager, Wayne Briggs, and confirmed that Imperial had a business relationship with IP. The procedure that Capital and Imperial had followed during the first several months of their relationship was as follows: IP would place an order with Imperial. Imperial would prepare an invoice and ship the goods to IP. An employee at IP would sign a receiving document ("receiver") indicating that IP had received the shipment. Parker would then fax a copy of the invoice and the accompanying receiver to Capital, and Capital would advance 80% of the invoice amount to Parker and then wait to be paid by IP.
 {¶ 21} Setzer and Nicolas Pittas, a vice-president of finance for a large factoring corporation, testified that the best proof of a valid and proper factoring relationship was prompt payment by the account debtor. Accordingly, Setzer testified that he had relied on the checks he had received from IP to continue his factoring relationship with Imperial. The checks were all made payable to Imperial.
 {¶ 22} To maintain due diligence, Setzer testified that, in October 1998, he requested that an employee of IP sign invoices to confirm delivery of certain chemicals to IP. The invoices were faxed back to Setzer purportedly with Lee Hibbard's signature on them. Hibbard, an employee of IP, testified that he had never signed an invoice and had never faxed any documents to Capital.
 {¶ 23} At the end of 1998, the first four-month period, Capital had advanced money on factored accounts in the amount of $355,472.21 and had received approximately $173,797.58 in payments from IP. Capital did not provide any purchase-order financing during the first four months.
 {¶ 24} Capital continued to receive checks from IP through January 1999. In January 1999, Parker informed Setzer that IP was slowing down production and that he needed additional money to keep his business running. Setzer agreed to provide purchase-order financing to Parker up to $250,000. Prior to advancing the money, Setzer visited Imperial's warehouse in Cincinnati and confirmed with Briggs that IP's relationship with Imperial was still in good standing. Additionally, Setzer requested that Parker fax him a copy of Imperial's current inventory as of January 15, 1999. The copy indicated that Imperial had inventory in the amount of $697,060, plus $180,000 worth of pulp that Parker was allegedly going to sell to IP. (Interestingly, Parker admitted at trial that he never owned the pulp and had to return it to the vendor.) Again, in February 1999, Parker sent Setzer an inventory sheet showing that Imperial had assets worth $863,197.50. Based on the foregoing, Setzer testified that he had provided purchase-order financing to Imperial. In addition, Capital continued to factor accounts receivable for Parker.
 {¶ 25} At the end of the second four-month period, Capital had advanced $165,191.54 to Imperial on factored accounts and had received approximately $158,851.53 in payments from IP.
 The Last Four Months {¶ 26} In April 1999, Parker asked Setzer to raise the limit for purchase-order financing. Setzer agreed to the increase, but required that Parker provide financial statements for each company he owned and that Parker sign a guaranty pledging the assets of Maid Service System, Inc., as collateral for the increase in purchase-order financing. The financial statements showed that Setzer had $2 million in equity in his businesses and that Maid Service System's inventory totaled $887,000. Setzer brought in another company to help finance the increase. During this last four-month period, Setzer advanced over $1 million to Parker's businesses.
 {¶ 27} Parker submitted IP invoices in April 1999 totaling $553,000 to pay down his purchase-order advances. Prior to accepting these invoices, Setzer informed Parker that he would need written confirmation from IP that it had ordered chemicals and had received them. On April 28, 1999, Setzer faxed a letter to Parker at Imperial requesting verification of the invoices by Briggs. On the same date, Parker faxed a letter to Setzer on Imperial letterhead requesting that the signature name be changed to Lee Hibbard. Setzer made this change because he had spoken with Hibbard before, and Parker later faxed Setzer a copy of the letter allegedly signed by Hibbard. Hibbard denied signing this document.
 {¶ 28} The $553,000 in invoices, which were allegedly confirmed by Hibbard, was allegedly paid with checks from IP. At trial, Capital demonstrated that all of the invoices and their accompanying receivers were fraudulent. IP denied ordering the amount of chemicals that Parker had invoiced. To perpetuate his fraud, Parker would deposit money into Capital's bank account and fax copies of purported IP checks with amounts covering the invoices. Specifically, Parker would receive checks from IP in smaller amounts (because it had never ordered the amounts Parker had listed on the invoices), and he would deposit those checks into his bank account, after first making a copy of the check. He would then eradicate the original amount and type in an amount that would correspond to the invoice. Parker would then use his own funds to cover the amount of the altered check. Parker would draw a cashier's check on his own account, deposit that check into Capital's bank account, and fax a copy of the altered check and a copy of the deposit slip to Setzer. Thus, although particular invoices were substantially paid down, Setzer testified that he had relied on these payments, supposedly from IP, to continue factoring accounts receivable for Imperial and to continue providing purchase-order advances. Setzer testified that if he had known that Parker was using his own funds, he would not have continued the relationship.
 {¶ 29} Eventually, Parker ran out of his own funds to cover the money he had received from Capital, and in August of 1999, the relationship between Capital and Parker deteriorated.
 {¶ 30} On August 4, 1999, Setzer faxed a copy of IP invoices outstanding to Parker, requesting that Parker have IP's accounting department verify that these amounts were correct. Parker faxed this document back to Setzer with the initials RL on it. Setzer was unable to identify any person from IP with those initials and told Parker that this was unacceptable.
 {¶ 31} At the end of August 1999, Capital's accounting records demonstrated that the face amount of IP invoices outstanding was $2,019,370.50. At that time, Setzer testified, Parker had informed Capital that all of the products covered by the outstanding invoices had to be returned to Imperial because there was a problem with the way the chemicals had been packaged. Parker informed Setzer that he was repackaging the materials in his Indiana warehouse and would try to sell them back to IP. Parker presented Setzer with an inventory sheet showing that Imperial had approximately $1,600,000 in inventory (allegedly the chemicals returned from IP). Setzer requested that Parker place the inventory in a bonded warehouse.
 {¶ 32} Setzer testified that Capital had tried to mitigate its damages by employing a consultant, Kevin King, to verify that the inventory was in Parker's Indiana warehouse and to find a buyer for the remaining inventory. Setzer testified that King had never been able to verify the inventory, and that once King had found a buyer for the remaining inventory, Parker had refused to let the buyer inspect the products.
 {¶ 33} On December 21, 1999, Setzer met with Parker, and, according to Setzer's testimony, Parker admitted that he had no warehouse in Indiana, that IP had never ordered, purchased, or received the bulk of the inventory represented in the outstanding invoices and that he (Parker) had falsified the invoices and receiving documents. Based on these admissions, Capital sent Imperial and Enterprises a letter indicating that they were in default of their agreements, and it also began a fraud investigation.
 {¶ 34} At trial, Setzer demonstrated that during this investigation he discovered that although Capital thought it had received in excess of $925,000 from IP, IP actually had only paid $339,183.11 of that amount. The rest was from Parker's own funds. Setzer also demonstrated that the accompanying receiving documents that Capital had relied on to factor accounts had been falsified. Parker admitted to having his own employees, instead of IP employees, sign a majority of the receiving documents throughout the last five months. Further, Setzer believed that Parker never had the amount of inventory in his warehouse that he had indicated on the inventory sheets faxed to Capital in January and February of 1999.
 {¶ 35} Pittas, the vice-president of finance for the large factoring corporation, testified to a reasonable degree of professional certainty that, within the factoring industry, Parker "after having obtained [Capital's] confidence, intentionally and in a well thought out textbook-like plan defrauded [Capital] through a series of fake invoices, fake receivers, fake checks and fake deposits."
 {¶ 36} Finally, it was demonstrated at trial that Imperial was still selling chemicals to IP from September 1999 to January 2000 but not having those accounts factored with Capital in violation of the factoring agreement. (The agreements required that Parker factor all of Imperial's invoices through Capital, not just some.) Imperial received approximately $335,000 in payments from IP during those months.
 Damages {¶ 37} Craig Leland Watt, a certified public accountant, testified on behalf of Capital. Watt testified that his company had prepared Capital's annual income tax returns from its inception and had prepared review-level financial statements since 1998. Upon review of Capital's accounting records, Watt testified that Capital's methodology was within generally accepted accounting principles.
 {¶ 38} Watt testified that he, in reaching his opinions, had reviewed invoices from Imperial to IP, copies of checks from IP to Imperial, and the bank records of Imperial and Capital. Watt determined that outstanding accounts receivable totaled $2,019,370.50. Watt testified that he "added all of the invoices purchased, subtracted the checks and subtracted out discounts and recourse to come up to that amount." He also testified that he traced wire transfers from Capital to Imperial to determine that a total of $1,604,291.72 was advanced. On cross-examination, Watt testified that he was aware that Capital's records demonstrated that it had received $3,200,000 from Parker's companies, but most of that money was paid to Capital on behalf of factored accounts for Innovative Management, another client of Parker's businesses, not for IP. Setzer testified that the accounts receivable from Innovative were not part of the pending litigation.
 The Trial Court's Decision {¶ 39} At the conclusion of the trial, the trial court entered 265 findings of fact and 19 conclusions of law. In sum, the trial court found that Setzer and Hopper's testimony was more credible than Parker's, and thus concluded that Parker had two separate factoring agreements: one on behalf of Imperial and one on behalf of Enterprises. The trial court also discounted Greene's testimony, concluding that it was unreliable and irrelevant to whether the guaranty had been forged. Greene's testimony was based on the fact that the factoring agreement on behalf of Enterprises contained a genuine signature. Parker testified that he did not know if the signature on that agreement was his genuine signature.
 {¶ 40} The trial court found that Parker had altered checks, invoices, and receiving documents, with the knowledge that Capital was relying on all those items to continue its factoring relationship with Parker's businesses, and it concluded that Parker had committed fraud. The trial court also found that Parker had never operated Enterprises as a corporation, and that Imperial, the sole proprietorship, was the one conducting business with IP. Thus, the trial court concluded that Parker was personally liable for the actual damages for fraud, breach of contract, and breach of guaranty.
 {¶ 41} The trial court found that Capital had proved its damages, including invoices with a face amount of $2,019,370.50, earned factoring fees of $102,815.29, and earned purchase-order fees of $29,015.13, for a total of $2,151,200.92. In addition, the trial court awarded pre- and post-judgment interest, as well as attorney fees in the amount of $91,882.38. The court further awarded punitive damages in the amount of the actual damages ($2,151,200.92) for fraud. Finally, the court determined that Capital could foreclose on the pledged assets of Maid Service System.
 {¶ 42} On appeal, Parker now brings forth four assignments of error.
 Exclusion of Expert Testimony {¶ 43} In the first assignment of error, Parker argues that the trial court erred in excluding testimony of Steven Greene, the forged-document expert. Parker offered Greene's expert testimony to demonstrate that his signature on the guaranty was forged, and thus that he was not personally liable for the actions of his companies. As we have already noted, Greene testified that if it was assumed that Exhibit 74 (the Enterprises factoring agreement) contained a genuine signature, the signature on Exhibit 76 (the guaranty) was forged. Greene concluded that Parker's signature on Exhibit 76 was either cut and pasted or traced. Parker argues that the court should have considered this evidence.
 {¶ 44} From our review of the record, we hold that any error committed by the trial court in not "admitting" Greene's testimony was harmless, because the record demonstrates that the court did consider and weigh Greene's testimony in reaching its decision.[1] The trial court specifically stated in its findings of fact and conclusions of law that Greene's testimony "has been considered in reaching the within findings." The court went on to make fifty-nine factual findings regarding that testimony.
 {¶ 45} While Parker offered Greene's testimony to prove that Exhibit 76 was forged, Greene could not say with a reasonable degree of certainty that it had been forged. Greene did testify that, out of the three documents he had reviewed, all three contained identical signatures. From that opinion, he concluded that two of the documents must have been forged or altered. But Greene could not say with certainty that the guaranty was the document that had been forged.
 {¶ 46} A review of the record demonstrates that the trial court weighed Greene's testimony with the testimony of Setzer and Hopper, both of whom testified that they had witnessed Parker signing the guaranty. Furthermore, when Greene was asked to compare Exhibit 76 with the copy of the guaranty (Exhibit 68) that Parker had produced at trial, Greene stated that the two signatures were different, indicating that both of those guaranties could have contained Parker's original signature. Additionally, Greene could not say that Parker had not scanned all three documents into his computer and then reproduced the signature line on each. (Capital had argued that Parker could have possibly done this after stealing the original documents from Setzer's office.)
 {¶ 47} Because the trial court considered and weighed Greene's testimony in reaching its decision that Parker did sign a personal guaranty on behalf of his companies, we overrule the first assignment of error.
 Personal Liability {¶ 48} In the second assignment of error, Parker argues that the trial court erred in concluding that Capital "had a power of attorney to make unilateral and undisclosed changes in documents appellant Parker allegedly executed." Parker maintains that the basis for the trial court's conclusion that Parker was individually liable was its finding that the power of attorney in the Enterprises factoring agreement "authorized Hopper to cross-out the name [Enterprises] and substitute [Imperial] in order to bind Parker individually to the terms of the factoring agreement without his knowledge." A thorough review of the record shows that this is incorrect.
 {¶ 49} The power of attorney in the factoring agreement authorized Capital to change the business entity's name in order to file the UCC financing statement against Parker's businesses. When Hopper discovered that Enterprises was not a registered corporation, he authorized the change so that the UCC statement could be filed against the sole proprietorship under which Parker was actually conducting his business.
 {¶ 50} The trial court determined that Parker was individually liable and had a contractual relationship with Capital under the name Imperial based on the exhibits admitted at trial and the testimony of Parker, Setzer, and Hopper. Additionally, the court made the finding that "Parker never operated as a corporation in his business dealings with International Paper and Capital Plus, Inc." This finding was supported by competent, credible evidence. Parker never filed corporate taxes, IP only had a contract with Imperial, and IP made payments to Imperial, the sole proprietorship.
 {¶ 51} Finally, the trial court determined that Parker was individually liable because of the fraud he had committed against Capital. Ohio law provides that a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment.[2] Parker was the only officer, with the exception of his wife for one company, and was responsible for the fraud against Capital.
 Damages {¶ 52} In the third assignment of error, Parker claims that the trial court erred in calculating Capital's damages. Specifically, Parker contends that the amount of damages was against the manifest weight of the evidence. We disagree.
 {¶ 53} When considering a manifest-weight argument, we cannot reverse the trial court's judgment if some competent, credible evidence supports it.[3] This standard rests on the strong presumption that the trial court, as the trier of fact, is best able to weigh the evidence presented, assess the credibility of the witnesses, and make informed factual determinations.[4]
An award of damages must be shown with a reasonable degree of certainty and in some manner other than mere speculation, conjecture, or surmise.[5]
 {¶ 54} Here, Capital offered the testimony of Watt, a certified public accountant, to prove its damages. Watt testified that Capital's accounting records properly demonstrated its damages. The records indicated that there were outstanding accounts receivable totaling $2,019,370.50. Included in the records were copies of every invoice and accompanying receiving document that Parker had presented to Capital for factoring, as well as evidence of all the payments (checks) allegedly received by Capital from IP.
 {¶ 55} Parker argues that Watt's testimony did not take into account Capital's cash-history report showing that Capital had received over $3 million from Enterprises. But Watt testified that those payments were on behalf of Innovative, another account debtor of Parker's companies, and that Innovative was not a part of this lawsuit. Parker also maintains that Watt did not consider that Capital owed rebates to Imperial and that those rebates were contained in wire transfers from Capital to Imperial. But Watt did consider the rebates. He testified that he had "added all of the invoices purchased, subtracted the checks and subtracted out discounts and recourse" when determining the amount of invoices outstanding. Further, he stated that this amount represented "accounts receivable that Capital Plus owned and they were * * * not paid on." If the accounts were never "paid on," then a rebate would not have even been available. Rebates were given after Capital collected the face amount of the invoice and had deducted its initial advance and fees.
 {¶ 56} Because there was competent, credible evidence to support the award of damages, we do not disturb the award.[6] Accordingly, the third assignment of error is overruled.
 Fraudulent Activity {¶ 57} In the final assignment of error, Parker maintains that the "trial court erred in finding that [Capital] had sustained its burden of proving fraud." Specifically, Parker argues that there was insufficient evidence that Capital had relied on "IP invoices" to provide purchase-order financing. We disagree.
 {¶ 58} When determining whether there is insufficient evidence to support a trial court's judgment in a civil case, we cannot reverse the judgment if some competent, credible evidence supports it.[7] We are also guided by the presumption that the findings of the trial court are correct.[8] "The trial court is entitled to make its own determination * * * as to the credibility of the witnesses because it is in the best position to observe the witnesses' gestures and voice inflections."[9]
 {¶ 59} From our review of the record, we are persuaded that there was competent, credible evidence that Capital did rely on IP invoices as well as the accompanying receiving documents, checks from IP, inventory sheets, guaranties, and pledges of assets by Maid Service Systems, Inc., to provide purchase-order financing to Imperial.
 {¶ 60} Pittas, the vice-president from the large factoring corporation, testified that the best proof of a good factoring relationship was prompt payment by the account debtor. Capital did not agree to provide purchase-order financing until it had been successfully factoring IP accounts for Imperial for over four months. And, at that time, it only agreed to a $250,000 advance after Setzer had received an inventory statement from Imperial and had confirmed with IP that it was still doing business with Imperial.
 {¶ 61} Prior to increasing the advance amounts, Capital had Parker execute a guaranty on behalf Maid Services System after receiving a list of that company's assets. The record also demonstrates that, in May 1999, Parker requested additional funding and transferred new "IP invoices" that were false to pay down his previous purchase-order advances. Setzer testified that Capital had agreed to more funding because it thought that Parker was paying down his purchase-order advances. But IP's business records indicated that the invoices and receiving documents that Parker had transferred to Capital were false.
 {¶ 62} Finally, Setzer testified that he had relied on the checks purportedly from IP to continue advancing money to Imperial. Parker knew that Capital relied on these checks because he had faxed a copy of a check each time he deposited money into Capital's account.
 {¶ 63} The record reveals that Parker gained Capital's confidence during the first four to eight months of their business relationship, and then used that confidence to his advantage to defraud Capital. So while Capital may not have relied on specific invoices to increase the purchase-order advances, it had relied on its previous factoring relationship, which had involved relying on invoices and receiving documents, and it had also relied on additional invoices transferred from Parker in May 1999 to pay down the purchase-order advances. Pittas also testified to a reasonable degree of professional certainty that Parker had gained Capital's confidence and then intentionally embarked on a scheme to defraud Capital.
 {¶ 64} Because there was competent, credible evidence to support the trial court's finding of fraud, we overrule the fourth assignment of error.
 {¶ 65} The judgment of the trial court is affirmed.
Judgment affirmed.
Winkler, P.J., and Painter, J., concur.
[1] See State v. Filiaggi (1999), 86 Ohio St.3d 230, 241-242,714 N.E.2d 867 (trial court's error in excluding experts' reports was harmless where court had opportunity to hear experts testify, and, therefore, the experts' opinions had been conveyed to and considered by the court).
[2] Bowes v. Cincinnati Riverfront Coliseum, Inc. (1983),12 Ohio App.3d 12, 18, 465 N.E.2d 904.
[3] C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 280, 376 N.E.2d 578.
[4] Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80, 461 N.E.2d 1273. See, also, Wallbrown v. Kent State Univ.
(2001), 143 Ohio App.3d 762, 768, 758 N.E.2d 1213.
[5] Persky, Shapiro, Salim, Esper, Arnoff Nolfi Co., L.P.A.v. Guyuron (Dec. 14, 2000), 8th Dist. No. 77249.
[6] Because Parker has only submitted arguments regarding actual damages, we do not address the award of attorney fees or punitive damages, except to say that there is competent, credible evidence to support those awards.
[7] Scott v. Chalk, 1st Dist. No. C-010331, 2002-Ohio-1980, citing C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.
[8] See Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
[9] Rogers v. Hill (1998), 124 Ohio App.3d 468, 470,706 N.E.2d 438.