[Cite as *Daly v. Rowe*, 2022-Ohio-3750.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CLIFFORD LAWTON DALY, JR., | : | APPEAL NOS. C-220026 |
| Plaintiff-Appellee/Cross-Appellant, | | C-220031 |
| | | TRIAL NO. A-1805658 |
| vs. | : | *O P I N I O N.* |
| BRUCE ROWE, | : | |
| COATING APPLICATIONS, INC., | | |
| COATING APPLICATIONS LLC, | : | |
| and | | |
| COATING APPLICATIONS INTERNATIONAL LLC, | : | |
| Defendants-Appellants/Cross-Appellees/Third-Party Plaintiffs, | : | |
| and | : | |
| KATHY R. DALY, | | |
| Third-Party Defendant, | : | |
| and | | |
| QUALITY COMPOSITES, INC., | : | |
| Interested-Party Defendant. | : | |

Civil Appeals From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:    Affirmed in Part, Reversed in Part, and Cause
                             Remanded

Date of Judgment Entry on Appeal: October 21, 2022


*DeBlasis Law Firm, LLC*, and *Rick D. DeBlasis*, for Plaintiff-Appellee/Cross-Appellant,

*Santen & Hughes* and *Brian P. O'Connor*, for Defendants-Appellants/Cross-Appellees.

**MYERS, Presiding Judge.**

{¶1}   Bruce Rowe and Clifford Daly were business partners for years until their relationship dissolved in 2018.  Daly brought suit against Rowe when he was locked out of the business, and these appeals follow the trial court's determination of claims between the parties.  Both plaintiff-appellee/cross-appellant Clifford Daly and defendants-appellants/cross-appellees Bruce Rowe, Coating Applications, Inc., Coating Applications LLC, and Coating Applications International LLC (collectively referred to as "defendants"),[1] appeal from the trial court's entry following a bench trial finding in favor of Daly on his claim for breach of fiduciary duty and awarding him damages.

{¶2}   In these appeals, we are asked to determine whether Daly had standing to pursue a direct claim for breach of fiduciary duty against Rowe or whether that claim had to be brought derivatively on behalf of the shareholders of the close corporation that Daly and Rowe had formed.  If we find that Daly had a viable individual claim, we must then review the trial court's award of damages. We conclude that the trial court did not err in granting judgment to Daly individually on his claim for breach of fiduciary duty.  But we further find that the trial court's award of damages was against the manifest weight of the evidence.  We accordingly reverse the trial court's award of damages and remand this case for further proceedings.

*Factual and Procedural Background*

{¶3}   Approximately 30 years ago, Daly and Rowe formed Quality Composites, Inc., ("QCI") a close corporation that owns the rights to a product known

---

[1] The Coating Application defendants, as acknowledged in Rowe's appellate brief, are Rowe's "wholly owned and controlled business entities."

as Braze Tape, a material used to bind metal products together. Daly and Rowe each own 50 percent of QCI. Daly is the president and treasurer of QCI, while Rowe is the vice-president and secretary. Daly and Rowe are also directors of the corporation, and each appointed one additional director.

{¶4} In 1992, QCI purchased the rights, title, and interest in Braze Tape, including the manufacturing process to make the tape, from Coating Applications, Inc., ("CAI") a corporation that is owned in part by Rowe. The parties intended QCI to operate as a holding company, and in 1994, QCI entered into an agreement with CAI authorizing CAI to sell and manufacture Braze Tape. While the agreement provided that CAI would receive between a five-percent and ten-percent commission on all Braze Tape sales, in practice, QCI never actually paid the commission referenced in the agreement. Rather, per the parties' standard practices, payments received for Braze Tape sales by CAI were deposited into a QCI-CAI joint-agency bank account. CAI sold other products in addition to Braze Tape, and payments received from the sale of CAI's other products were also deposited into the joint-agency bank account. After payments were deposited into the joint-agency bank account, money received for Braze Tape sales was transferred into a separate corporate account for QCI.

{¶5} QCI was a subtenant of CAI, and it paid a certain percentage of the utilities and rent for the office premises. QCI also paid CAI for any bills that were submitted for time and material, and labor involved in the manufacture of Braze Tape. All profits earned by QCI were equally split between Daly and Rowe, and they were paid from the QCI account.

{¶6} Unfortunately, the relationship between the parties soured, as Rowe began to suspect that Daly was divulging CAI's trade secrets. Rowe believed Daly

4

produced Braze Tape on his own and had misrepresented the quality of the product when doing so. On May 28, 2018, Rowe evicted Daly and QCI from the office premises. Daly taped the agreement executed between QCI and CAI in 1994 to the wall, along with a note stating that the old contract was, as of that day, back in effect. Daly has had no access to the premises since that date. Nor has he received any payment from QCI since the eviction. On August 24, 2018, Daly, in his capacity as president of QCI, sent notice to Rowe that he was terminating QCI's agreement with CAI.

{¶7} Daly, both individually and derivatively on behalf of QCI, and QCI filed suit against defendants. Daly did not make a demand on QCI's Board of Directors before filing the action derivatively on behalf of the corporation. He alleged in the complaint that "[i]t would be futile for Daly to make further demand on the Board of Directors of QCI for several reasons. Daly and Rowe are 50/50 shareholders of QCI. Further demand would require Rowe to investigate and bring claims against himself for his abusive conduct as described herein. Rowe has clearly evidenced his intent not to take any action to correct his misconduct."

{¶8} The complaint sought a declaratory judgment and injunctive relief authorizing Daly to terminate the agreement between QCI and CAI, enjoining defendants from selling Braze Tape, and authorizing Daly to relicense the sale of Braze Tape to other vendors. The complaint additionally asserted claims for breach of fiduciary duty, accounting, conversion, theft, replevin, and breach of contract. In support of the asserted claims, the complaint alleged that Rowe sold Braze Tape without authorization, converted and/or stole checks due to QCI, and wrongfully evicted Daly and QCI from the premises.

{¶9} Defendants filed counterclaims against Daly and QCI for a violation of 18 U.S.C. 1030 (the Computer Fraud and Abuse Act), breach of fiduciary duty, theft, a violation of Ohio's Deceptive Trade Practices Act, and bad faith. They additionally sought a declaratory judgment that Rowe was entitled to indemnification from QCI for the costs incurred in defending the lawsuit brought against him. Defendants also filed third-party claims for a violation of the Computer Fraud and Abuse Act, theft, and a violation of Ohio's Deceptive Trade Practices Act against Kathy Daly, Daly's wife who had worked as an office manager for QCI.

{¶10} Defendants filed a motion to disqualify counsel for Daly and QCI, arguing that QCI's Board of Directors had never been asked to vote to authorize the lawsuit and that counsel would have "divided loyalties" if engaged in representation of both plaintiffs. Subsequent to the filing of this motion, QCI retained separate counsel. The court denied the motion to disqualify, stating in relevant part:

> In this case, the Court finds that a demand for a vote by the board of directors would have been pointless as Mr. Rowe owns the other 50% of the company. Additionally, even if there was an issue of adequate representation by [Daly's counsel], QCI is now represented by independent counsel. QCI is a nominal but necessary party to this case.

The parties later filed an agreed entry realigning QCI as an interested-party defendant.

{¶11} Daly and third-party defendant Kathy Daly moved for summary judgment on defendants' counterclaims and third-party claims for violations of the Computer Fraud and Abuse Act and Ohio's Deceptive Trade Practices Act, breach of fiduciary duty, and theft. The trial court granted the motion with respect to the claims for a violation of the Computer Fraud and Abuse Act and theft. But it found that

genuine issues of material fact existed with respect to the claims for breach of fiduciary duty and a violation of Ohio's Deceptive Trade Practices Act.

{¶12} Defendants moved for summary judgment on Daly's claims for accounting, conversion, and breach of contract. The trial court granted the motion on all three claims, additionally stating in its entry that it was of the opinion that the claims for theft and replevin should also be dismissed but it could not dismiss them because those claims had not been subject to the motion for summary judgment. Daly subsequently elected not to pursue the replevin claim at trial. Daly also abandoned the breach-of-fiduciary-duty claim that he had brought derivatively on behalf of QCI and pursued that claim only in his individual capacity.

{¶13} The case proceeded to a bench trial on all remaining claims. Daly and Rowe both testified about the business practices of, and the nature of the relationship between, QCI and CAI from the relationship's inception until Rowe essentially evicted Daly and QCI from the premises in May of 2018. Several historical profit-and-loss statements were entered into evidence. With respect to QCI's earnings and Daly's claimed lost profits following the eviction, Daly identified an exhibit detailing QCI's earnings in the five-year period preceding the eviction. He testified as follows about the exhibit and the corporation's historical earnings:

Counsel: And what were the total sales of QCI for that five-year period?

Daly: That would be $1,689,230.

Counsel: And so if we divide that number by five, we get about $330,000 annual sales?

Daly: That would be a good average.

Counsel: Okay. And of course it's been—this would have been three-plus years since you were ejected from QCI; is that right?

Daly: That's correct.

Counsel: So in the normal course, you would expect something in excess of a million dollars having been sold by CAI for QCI in that time period; is that right?

Daly: That would be a good estimate.

Counsel: All right. And is there a line in here that denotes what Mr. Rowe took out of the company in those five years?

Daly: Yes, there would be. On the second page, Page 2, of that, up near the top where it says "Professional Fees," under "Consulting." That would be Mr. Rowe's, his take.

Counsel: Okay. So he was paid wages, or was he paid distributions?

Daly: I believe he was paid a consulting fee.

Counsel: That's how he took his part of the profits?

Daly: That's correct.

Counsel: So over that five-year period, he took out almost—well, $276,000 per year?

Daly: I think that's a five-year period.

Counsel: Five-year period, pardon.

Daly: Yes.

Counsel: I'm just going to do a tiny bit of math here. So about $55,000 a year was his share of the profits.

Daly: Yes.

Counsel: QCI's business?

Daly: Correct.

Counsel: And where in this report is—and that represents 16.3 percent of the gross income?

Daly: Yes; of the sales.

Counsel: Of the sales. And that's just his share. That's not both of you; that's just his share.

Daly: That's correct.

Counsel: And so where are yours? Where does your money come out?

Daly: Well, if you look on Page 1, you'll see "Net Wages." And that 199,000 represents my take-home pay; after taxes.

Counsel: Okay. And so there would be withholdings; FICA, Social Security, Medicare, I think?

Daly: Correct.

* * *

Counsel: So you were paid, actually, W-2 wages, and Mr. Rowe was paid consulting fees. Is that's what you're telling me?

Daly: That's correct, that's correct.

Counsel: And were you each paid the same amount over this five-year period?

Daly: Yes. We would take exactly the same amount of money out.

Counsel: So if I were to ask you what the average annual partner's percentage of sales is a good number to determine profits, what number would you say it is?

Daly: I would say whatever that—if you look under Consulting, the 16.3,

since I would take the same amount, I would say 32.6 would be—

Counsel: Total, split in half?

Daly: Yes.

Counsel: 16.3 percent for each of you?

Daly: Yes.

{¶14} In other words, Daly's testimony established that QCI's historical profit margin was approximately 32.6 percent of gross sales. Thus, even though they received payment in different forms, Rowe and Daly each received 16.3 percent of the gross sales revenue historically.

{¶15} Daly and Rowe also both testified about joint exhibit 15, which consisted of multiple invoices that they agreed were for CAI's sales of Braze Tape from April of 2018 through sometime in 2021. According to Daly, these invoices totaled $338,711.37, and he never received any of his share of the profits for these sales.

{¶16} In addition to the agreed-upon invoices in joint exhibit 15, Daly testified about additional invoices that CAI had submitted to various customers in the years after the eviction. Daly and Rowe disputed whether these additional invoices were for the sales of Braze Tape or for other products manufactured by CAI. With respect to this group of invoices, Daly testified with certainty that particular invoices were for the sale of Braze Tape. As to other invoices in this group, Daly could only state that they were "likely" or "probably" for sales of Braze Tape. Rowe also testified about these disputed invoices, and he conceded that many of the invoices were for the sale of Braze Tape.

{¶17} Daly ultimately estimated that CAI had invoiced over one million dollars in sales since he was evicted from the premises. And he opined that based on his historical share of profits prior to the eviction, he was entitled to receive in profits approximately 16.3 percent of sales during that time period.

{¶18} Rowe also testified about QCI's historical profit margin, agreeing with Daly that QCI's average profit margin was approximately one third of all sales, with he and Daly each receiving 16.3 percent of that amount. He also testified that Daly had not been paid by QCI since the eviction, and that no money for the sale of Braze Tape had been transferred into QCI's own account. Rather, QCI's money was held in a bank account in the name of C A Patents. Rowe explained that C A Patents was the holding company for his patents, and that money received by CAI was placed into the C A Patents account.

{¶19} Rowe identified multiple checks written from the C A Patents account that were clearly for his own personal expenses. Included in these personal expenses were payments to his daughter, to a country club, for automobile repairs and expenses, and for medical bills. These totaled approximately $45,000.

{¶20} The trial court found in favor of Daly on his claim for a declaratory judgment and injunctive relief, and it issued a declaratory judgment authorizing him, as president of QCI, to terminate the agreement between QCI and CAI and to relicense the sale of Braze Tape to other vendors. Defendants have not appealed this portion of the trial court's judgment.

{¶21} The court also found in favor of Daly on his claim for breach of fiduciary duty. With respect to damages for the breach of fiduciary duty, the court found that Daly "presented a theory of lost profits at trial, but failed to carry his burden of proof

regarding the alleged lost profits. Plaintiff's proof of gross revenue and profit was speculative." The court further found that Rowe had admitted to spending QCI's profits and that the evidence demonstrated that "Rowe at least in part siphoned the income from Braze Tape sales in cash and checks made payable to himself and others, as well as payments for Rowe's personal, recreational and medical expenses." The court stated that these actions constituted a breach of fiduciary duty to Daly and QCI, and that Daly was entitled to damages in the amount of $45,090.47 for this breach.

{¶22} The court found in favor of defendants on Daly's remaining claim for theft. And it found in favor of Daly and Kathy Daly on the counterclaims and third-party claims that defendants had asserted against them.[2]

{¶23} Both the defendants and Daly have appealed the trial court's decision. In a single assignment of error, defendants argue that the trial court erred in granting judgment in favor of Daly. In this assignment of error, they argue that Daly lacked standing to pursue a direct claim for breach of fiduciary duty, that it was error to award damages on the claim for breach of fiduciary duty after finding that Daly failed to carry his burden of proving damages, and that, if damages were properly awarded, the trial court's calculation of damages was erroneous.

{¶24} In his cross-appeal, Daly argues in a single assignment of error that the trial court erred in finding that he failed to carry his burden of proving lost-profit damages.

---

[2] Testimony was presented on these claims at trial, but as the claims were ultimately found to be without merit and that finding is not being challenged on appeal, it is not necessary to discuss the testimony offered in support of them.

### *Breach of Fiduciary Duty*

**{¶25}** We first address the portion of defendants' assignment of error arguing that the trial court erred in granting judgment in favor of Daly because he lacked standing to pursue a direct claim for breach of fiduciary duty. Defendants do not challenge the trial court's finding that a breach of fiduciary duty occurred, but rather contend that the claim belonged to the corporation, rather than to Daly individually.

**{¶26}** QCI is a close corporation. A close corporation is "generally characterized as a corporation with few shareholders who own shares that are not traded on a securities market." *Vontz v. Miller*, 2016-Ohio-8477, 111 N.E.3d 452, ¶ 30 (1st Dist.). In such a corporate structure, which resembles a partnership, "the relationship between the shareholders must be one of trust, confidence and loyalty to thrive." *Id.* at ¶ 31, quoting *Crosby v. Beam*, 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989). Although a close corporation provides many benefits, the nature of the corporate structure "also gives majority or controlling shareholders opportunities to oppress minority shareholders." *Crosby* at 108. For this reason, a heightened fiduciary duty exists between majority and minority shareholders in a close corporation. *Id.*; *Maas v. Maas*, 2020-Ohio-5160, 161 N.E.3d 863, ¶ 70 (1st Dist.).

**{¶27}** This heightened fiduciary duty applies not only to majority shareholders, but to "controlling shareholders" as well. *Crosby* at 109; *Vontz* at ¶ 35. And it has been held to apply in a close corporation where the corporate owners are equal shareholders (as are Daly and Rowe) where one shareholder who is not technically a majority owner "exercises 'control over the corporation to an extent that [the shareholder's] actions dominate[].' " *Vontz* at ¶ 35, quoting *McLaughlin v.*

*Beeghly*, 84 Ohio App.3d 502, 506-507, 617 N.E.2d 703 (10th Dist.1992); *see Heaton v. Rohl*, 193 Ohio App.3d 770, 2011-Ohio-2090, 954 N.E.2d 165, ¶ 54 (11th Dist.).

**{¶28}** A claim for a breach of this heightened fiduciary duty may be brought directly by a shareholder on her or his own behalf or derivatively by a shareholder on behalf of the corporation. *Maas* at ¶ 71. A derivative action is appropriate where an injury directly affects the corporation and only indirectly affects the shareholders, whereas a direct action by a shareholder is appropriate when a complaining shareholder suffers an injury directly. *Id.* at ¶ 72. In a direct action, "[t]he injury to the shareholder must be separate and distinct from the injury to the corporation." *Id.* If the defendant's wrongdoing has caused direct harm to the corporate worth, the cause of action accrues to the corporation, rather than to an individual shareholder. *Id.* at ¶ 73. This is true:

> even though in an economic sense real harm may well be sustained by
> the shareholders as a result of reduced earnings, diminution in the value
> of ownership, or accumulation of personal debt and liabilities from the
> company's financial decline. The personal loss and liability sustained
> by the shareholder is both duplicative and indirect to the corporation's
> right of action.

*Id.* at ¶ 77, quoting *Adair v. Wozniak*, 23 Ohio St.3d 174, 178, 492 N.E.2d 426 (1986).

**{¶29}** Here, an understanding of the corporate structure of QCI is helpful in determining whether Daly suffered an injury separate and distinct from QCI. Daly and Rowe each own 50 percent of QCI and, until Daly's eviction, split all corporate profits equally. Per the parties' standard business practices, payments received for sales of Braze Tape by CAI were initially deposited into the QCI-CAI joint-agency account, and

then later transferred into a corporate account for QCI. After QCI paid all necessary expenses, including rent, utilities, cost of materials, and bills submitted by CAI, all remaining profits were split equally between Daly and Rowe. QCI never retained any earnings.

{¶30} It is clear from the record, and the parties' statements during oral argument before this court, that profits earned on the sale of Braze Tape were not reinvested into QCI, but rather were wholly distributed to Daly and Rowe. And it is also clear that QCI continued to pay all its expenses. So while QCI itself has not received any payments for the sale of Braze Tape since Rowe evicted Daly in May of 2018, it has suffered no injury from Rowe's breach of fiduciary duty: it has not incurred any debt and it would have distributed all profits to Daly and Rowe. Rowe's actions have caused no direct harm to QCI's corporate worth. *See Maas*, 2020-Ohio-5160, 161 N.E.3d 863, at ¶ 73. Rather, it was Daly who suffered the injury in this case, as Rowe retained all profits from Braze Tape sales, including those to which Daly was entitled.

{¶31} Because Daly suffered an injury separate and distinct from QCI, he had standing to bring a direct claim for breach of fiduciary duty, and the trial court did not err in awarding judgment in his favor on that claim.

### *Damages*

{¶32} Having determined that no error occurred in the trial court's finding that Daly was directly injured by Rowe's breach of fiduciary duty, we now turn to the trial court's award of damages for that breach.

{¶33} In their assignment of error, defendants argue that the trial court erred in awarding damages after finding that Daly failed to carry his burden of proving

damages, and that, if damages were properly awarded, the trial court's calculation of damages was erroneous. Daly similarly attacks the trial court's award of damages in his cross-appeal, arguing that the trial court erred in finding that he failed to carry his burden of proving damages.

{¶34} In a civil bench trial, we review a trial court's award of damages to determine whether it is against the manifest weight of the evidence. *Danopulos v. Am. Trading II, LLC*, 2021-Ohio-2196, 174 N.E.3d 493, ¶ 7 (1st Dist.). Under such review, the trial court's judgment will only be reversed if the court clearly lost its way and created a manifest miscarriage of justice. *Id.*

{¶35} In determining whether the trial court's award of damages was supported by the weight of the evidence, we are mindful that "[a]n award of damages must be shown with a reasonable degree of certainty and in some manner other than mere speculation, conjecture, or surmise." *Id.* at ¶ 9, quoting *Capital Plus, Inc. v. Parker Ents. Imperial Dist., Inc.*, 1st Dist. Hamilton No. C-030046, 2004-Ohio-3896, ¶ 53. But "once a plaintiff establishes a right to damages, plaintiff's right will not be denied merely because the damages cannot be calculated with mathematical certainty." *Id.*, quoting *Austin v. Chukwuani*, 2017-Ohio-106, 80 N.E.3d 1199, ¶ 21 (8th Dist.).

{¶36} Here, with respect to damages, the trial court found that Daly had "presented a theory of lost profits at trial, but failed to carry his burden of proof regarding the alleged lost profits. Plaintiff's proof of gross revenue and profit was speculative." The court further found that although Daly had failed to prove lost profits, he had proved $45,090.47 in damages for Rowe's breach of fiduciary duty in wrongfully taking corporate assets for his own use. So, contrary to defendants'

argument, the trial court did not find that Daly had entirely failed to carry his burden of proving damages.

**{¶37}** Turning to the trial court's finding that Daly's proof of lost profits was speculative, we hold that the trial court's finding was against the manifest weight of the evidence. The damages established by Daly were imprecise, but they were not speculative.

**{¶38}** Daly testified to QCI's average annual sales and its profit margins, as well the percentage of the profits that he and Rowe had received from those sales, in the five-year period preceding his eviction from the premises. In addition, Daly identified multiple invoices that the parties agreed were for CAI's sales of Braze Tape from April of 2018 through sometime in 2021. He testified that these invoices totaled $338,711.37, and that he never received any of his share of the profits for these sales. Daly also identified additional invoices submitted by CAI to various customers following the eviction that were in dispute by the parties as to whether they were for the sales of Braze Tape or for other products manufactured by CAI. Rowe also testified about these disputed invoices, and he conceded that many of the invoices were for the sale of Braze Tape. It was established that payments received for these invoices were owed to QCI, but were never transferred into QCI's account and never shared with Daly.

**{¶39}** Daly opined that based on the historical share of profits that he had received prior to the eviction, he was entitled to receive in profits approximately 16.3 percent of the gross sales made during the time period subsequent to the eviction.

**{¶40}** The record establishes that while Daly was unable to provide an exact amount of sales or profit that QCI had received in the disputed time period, he

provided historical testimony about the corporation's annual earnings and his share of those earnings in the five-year period prior to the eviction, as well as testimony about the sales that QCI had made in the time period following the eviction. There was nothing speculative about Daly's testimony or the evidence presented regarding QCI's lost profits. The trial court's holding to the contrary was against the manifest weight of the evidence.

{¶41} Daly's assignment of error challenging the trial court's finding that he failed to carry his burden of proving damages is sustained, and the trial court's award of damages is reversed. We need not address the remainder of the defendants' assignment of error on the issue of damages, as it challenges the now-reversed award of damages. The defendants' assignment of error is accordingly overruled.

### *Conclusion*

{¶42} Because Daly suffered an injury separate and distinct from QCI, the trial court did not err in finding that he had standing to bring a direct claim for breach of fiduciary duty. But the trial court erred in finding that Daly failed to carry his burden of proving damages and in finding that Daly's proof of lost profits was speculative, and its award of damages is reversed. The case is remanded to the trial court to determine an award of damages consistent with the law and this opinion.

Judgment affirmed in part, reversed in part, and cause remanded.

**BERGERON** and **BOCK, JJ.,** concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.

18